# WASHINGTON ET AL. *v.* SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

No. 81–9.   Argued March 22, 1982—Decided June 30, 1982

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 488.

*Kenneth O. Eikenberry,* Attorney General of Washington, argued the cause for appellants. With him on the briefs were *Malachy R. Murphy,* Deputy Attorney General, *Thomas F. Carr,* Senior Assistant Attorney General, and *Timothy R. Malone,* Assistant Attorney General. *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace,* and *Richard G. Wilkins* filed a brief for the United States.

*Michael W. Hoge* argued the cause for appellees. With him on the brief for appellees Seattle School District No. 1 et al. were *Camden M. Hall* and *David J. Burman. Phillip L. Burton, Frederick L. Noland, Thomas A. Lemly,* and *William H. Neukom* filed a brief for appellees American Civil Liberties Union et al. *Ladd Leavens* filed a brief for appellees East Pasco Neighborhood Council et al.*

JUSTICE BLACKMUN delivered the opinion of the Court.

We are presented here with an extraordinary question: whether an elected local school board may use the Fourteenth Amendment to *defend* its program of busing for integration from attack by the State.

## I

### A

Seattle School District No. 1 (District), which is largely coterminous with the city of Seattle, Wash., is charged by state law with administering 112 schools and educating approximately 54,000 public school students. About 37% of these

---

*Briefs of *amici curiae* urging affirmance were filed by *Henry M. Aronson* for Grant L. Anderson et al.; by *Palmer Smith* for the League of Women Voters of Seattle et al.; by *Jack Greenberg, James M. Nabrit III,* and *Bill Lann Lee* for the NAACP Legal Defense and Educational Fund; and by *Judith A. Lonnquist* for the Washington Education Association.

Briefs of *amici curiae* were filed by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon* for the National School Boards Association; and by *William J. Bender* for the Seattle Chapter Japanese American Citizens League.

children are of Negro, Asian, American Indian, or Hispanic ancestry. Because segregated housing patterns in Seattle have created racially imbalanced schools, the District historically has taken steps to alleviate the isolation of minority students; since 1963, it has permitted students to transfer from their neighborhood schools to help cure the District's racial imbalance.[1]

Despite these efforts, the District in 1977 came under increasing pressure to accelerate its program of desegregation.[2] In response, the District's Board of Directors (School Board) enacted a resolution defining "racial imbalance" as "the situation that exists when the combined minority student enrollment in a school exceeds the districtwide combined average by 20 percentage points, provided that the single minority enrollment . . . of no school will exceed 50 percent of the student body." 473 F. Supp. 996, 1006 (WD Wash. 1979). The District resolved to eliminate all such imbalance from the Seattle public schools by the beginning of the 1979–1980 academic year.[3]

---

[1] In 1971, the District implemented a program of mandatory reassignments to integrate certain of its middle schools. This prompted an attempt to recall four School Board members who had voted for the program. That attempt narrowly failed. See 473 F. Supp. 996, 1006 (WD Wash. 1979).

[2] Several community organizations threatened legal action if the District did not initiate a more effective integration effort, while the Mayor of Seattle and a number of community leaders, by letter dated May 20, 1977, urged the District to adopt "a definition of racial isolation and measurable goals leading to the elimination of racial isolation in the Seattle Public Schools prior to a Court ordered and mandated desegregation remedy." App. 139.

[3] The District Court found that the actions of the School Board were prompted by its members' "desire to ward off threatened litigation, their desire to prevent the threatened loss of federal funds, their desire to relieve the black students of the disproportionate burden which they had borne in the voluntary efforts to balance the schools racially and their perception that racial balance in the schools promotes the attainment of equal educational opportunity and is beneficial in the preparation of all students for democratic citizenship regardless of their race." 473 F. Supp., at 1007.

In September 1977, the District implemented a "magnet" program, designed to alleviate racial isolation by enhancing educational offerings at certain schools, thereby encouraging voluntary student transfers. A "disproportionate amount of the overall movement" inspired by the program was undertaken by Negro students, however, *ibid.*, and racial imbalance in the Seattle schools was found to have actually increased between the 1970–1971 and 1977–1978 academic years. The District therefore concluded that mandatory reassignment of students was necessary if racial isolation in its schools was to be eliminated. Accordingly, in March 1978, the School Board enacted the so-called "Seattle Plan" for desegregation. The plan, which makes extensive use of busing and mandatory reassignments, desegregates elementary schools by "pairing" and "triading" predominantly minority with predominantly white attendance areas, and by basing student assignments on attendance zones rather than on race. The racial makeup of secondary schools is moderated by "feeding" them from the desegregated elementary schools. App. 142–143. The District represents that the plan results in the reassignment of roughly equal numbers of white and minority students, and allows most students to spend roughly half of their academic careers attending a school near their homes. Brief for Appellee Seattle School District No. 1, p. 5.

The desegregation program, implemented in the 1978–1979 academic year, apparently was effective: the District Court found that the Seattle Plan "has substantially reduced the number of racially imbalanced schools in the district and has substantially reduced the percentage of minority students in those schools which remain racially imbalanced." 473 F. Supp., at 1007.

B

In late 1977, shortly before the Seattle Plan was formally adopted by the District, a number of Seattle residents who opposed the desegregation strategies being discussed by the School Board formed an organization called the Citizens for

462

Voluntary Integration Committee (CiVIC). This organization, which the District Court found "was formed because of its founders' opposition to The Seattle Plan," *ibid.*, attempted to enjoin implementation of the Board's mandatory desegregation program through litigation in state court; when these efforts failed, CiVIC drafted a statewide initiative designed to terminate the use of mandatory busing for purposes of racial integration.[4] This proposal, known as Initiative 350, provided that "no school board . . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence . . . and which offers the course of study pursued by such student . . . ." See Wash. Rev. Code § 28A.26.010 (1981).[5] The initiative then set out, however, a number of broad exceptions to this requirement: a student may be assigned beyond his neighborhood school if he "requires special education, care or guidance," or if "there are health or safety hazards, either natural or man made, or physical barriers or obstacles . . . between the student's place of residence and the nearest or next nearest school," or if "the school nearest or next nearest to his place of residence is unfit or inadequate because of overcrowding, unsafe conditions or lack of physical facilities." See *ibid.* Initiative 350 also specifically proscribed use of seven enumerated methods of "indirec[t]" student assignment—among them the redefinition of attendance zones, the pairing of schools, and the use of

---

[4] Washington's Constitution reserves to the people of the State "the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature." Wash. Const., Art. II, § 1. Such initiatives are placed on the ballot upon the petition of 8% of the State's voters registered and voting for governor at the last preceding regular gubernatorial election. § 1(a). If passed by the electorate, an initiative may not be repealed by the state legislature for two years, although it may be amended within two years by a vote of two-thirds of each house of the legislature. § 41. See generally Comment, Judicial Review of Laws Enacted by Popular Vote, 55 Wash. L. Rev. 175 (1979).

[5] The text of Initiative 350 is now codified as Wash. Rev. Code §§ 28A.26.-010–28A.26.900 (1981).

"feeder" schools—that are a part of the Seattle Plan. See § 28A.26.030. The initiative envisioned busing for racial purposes in only one circumstance: it did not purport to "prevent any court of competent jurisdiction from adjudicating constitutional issues relating to the public schools." See § 28A.26.060.

Its proponents placed Initiative 350 on the Washington ballot for the November 1978 general election. During the ensuing campaign, the District Court concluded, the leadership of CiVIC "acted legally and responsibly," and did not address "its appeals to the racial biases of the voters." 473 F. Supp., at 1009. At the same time, however, the court's findings demonstrate that the initiative was directed solely at desegregative busing in general, and at the Seattle Plan in particular. Thus, "[e]xcept for the assignment of students to effect racial balancing, the drafters of Initiative 350 attempted to preserve to school districts the maximum flexibility in the assignment of students," id., at 1008, and "[e]xcept for racially-balancing purposes" the initiative "permits local school districts to assign students other than to their nearest or next nearest schools for most, if not all, of the major reasons for which students are at present assigned to schools other than their nearest or next nearest schools." Id., at 1010.[6] In campaigning for the measure, CiVIC officials accurately represented that its passage would result in "no loss of school district flexibility other than in busing for desegregation purposes," id., at 1008, and it is evident that the campaign focused almost exclusively on the wisdom of "forced busing" for integration. See id., at 1009.

On November 8, 1978, two months after the Seattle Plan went into effect, Initiative 350 passed by a substantial margin, drawing almost 66% of the vote statewide. The initiative failed to attract majority support in two state legislative

---

[6]At the beginning of the 1978–1979 academic year, approximately 300,000 of the 769,040 students enrolled in Washington's public schools were bused to school. Ninety-five percent of these students were transported for reasons unrelated to race. 473 F. Supp., at 1002.

districts, both in Seattle. In the city as a whole, however, the initiative passed with some 61% of the vote. Within the month, the District, together with the Tacoma and Pasco School Districts,[7] initiated this suit against the State in the United States District Court for the Western District of Washington, challenging the constitutionality of Initiative 350 under the Equal Protection Clause of the Fourteenth Amendment. The United States and several community organizations intervened in support of the District;[8] CiVIC intervened on behalf of the defendants.

After a 9-day trial, the District Court made extensive and detailed findings of fact. The court determined that "[t]hose Seattle schools which are most crowded are located in those areas of the city where the preponderance of minority families live." *Id.*, at 1001. Yet the court found that Initiative 350, if implemented, "will prevent the racial balancing of a significant number of Seattle schools and will cause the school system to become more racially imbalanced than it presently is," "will make it impossible for Tacoma schools to maintain their present racial balance," and will make "doubtful" the

---

[7] Along with Seattle, Tacoma School District No. 10 and Pasco School District No. 1 are the only districts in the State of Washington with comprehensive integration programs, and therefore the three are the only districts affected by Initiative 350. See *id.*, at 1009. Since 1965, Pasco has made use of school closures and a mandatory busing program to overcome the racial isolation caused by segregated housing patterns; if students attended the schools nearest their homes, three of Pasco's seven elementary schools would have a primarily white and three a primarily minority student body. *Id.*, at 1002–1003. The Tacoma School District has made use of school closures, racially controlled enrollment at magnet schools, and voluntary transfers—though not mandatory busing—to enhance racial balance in its schools. *Id.*, at 1003–1004.

[8] Several of the intervenor plaintiffs also alleged that the District had engaged in *de jure* segregation, and therefore was operating an unconstitutional dual school system. The District Court therefore bifurcated the litigation, first addressing the constitutionality of Initiative 350. Because of the court's conclusions on that question, the allegations of *de jure* segregation did not go to trial and have not been addressed by the District Court or by the Court of Appeals.

prospects for integration of the Pasco schools. *Id.*, at 1010; see *id.*, at 1001, 1011. Except for desegregative busing, however, the court found that "almost all of the busing of students currently taking place in [Washington] is permitted by Initiative 350." *Id.*, at 1010. And while the court found that "racial bias . . . is a factor in the opposition to the 'busing' of students to obtain racial balance," *id.*, at 1001, it also found that voters were moved to support Initiative 350 for "a number of reasons," so that "[i]t is impossible to ascertain all of those reasons [o]r to determine the relative impact of those reasons upon the electorate." *Id.*, at 1010.

The District Court then held Initiative 350 unconstitutional for three independent reasons. The court first concluded that the initiative established an impermissible racial classification in violation of *Hunter* v. *Erickson*, 393 U. S. 385 (1969), and *Lee* v. *Nyquist*, 318 F. Supp. 710 (WDNY 1970) (three-judge court), summarily aff'd, 402 U. S. 935 (1971), "because it permits busing for non-racial reasons but forbids it for racial reasons." 473 F. Supp., at 1012. The court next held Initiative 350 invalid because "a racially discriminatory purpose was one of the factors which motivated the conception and adoption of the initiative." *Id.*, at 1013.[9] Finally, the District Court reasoned that Initiative 350 was unconstitutionally overbroad, because in the absence of a

---

[9] The District Court acknowledged that it was impossible to determine whether the supporters of Initiative 350 "subjectively [had] a racially discriminatory intent or purpose," because "[a]s to that subjective intent the secret ballot raises an impenetrable barrier." *Id.*, at 1014. The court looked instead to objective factors, noting that it "marked [a] departure from the norm . . . for the autonomy of school boards to be restricted relative to the assignment of students," and that it marked a similar "departure from the procedural norm" for "an administrative decision of a subordinate local unit of government . . . [to be] overridden in a statewide initiative." *Id.*, at 1016. These factors, when coupled with the "racially disproportionate impact of the initiative," its "historical background," and "the sequence of events leading to its adoption," were found to demonstrate that a "racially discriminatory intent or purpose was at least one motivating factor in the adoption of the initiative." *Ibid.*

court order it barred even school boards that had engaged in *de jure* segregation from taking steps to foster integration.[10] *Id.*, at 1016. The court permanently enjoined implementation of the initiative's restrictions.

On the merits, a divided panel of the United States Court of Appeals for the Ninth Circuit affirmed, relying entirely on the District Court's first rationale. 633 F. 2d 1338 (1980).[11] By subjecting desegregative student assignments to unique treatment, the Court of Appeals concluded, Initiative 350 "both creates a constitutionally-suspect racial classification and radically restructures the political process of Washington by allowing a state-wide majority to usurp traditional local authority over local school board educational policies." *Id.*, at 1344. In doing so, the court continued, the initiative "*remove[s]* from local school boards their existing authority, and in large part their capability, to enact programs designed to desegregate the schools." *Id.*, at 1346 (emphasis in original and footnote omitted). The court found such a result contrary to the principles of *Hunter* v. *Erickson, supra,* and *Lee* v. *Nyquist, supra.* The court acknowledged that the issue would be a different one had a successor school board attempted to rescind the Seattle Plan. Here, however, "a different governmental body—the state-wide electorate—rescinded a policy voluntarily enacted by locally elected school boards already subject to local political control." 633 F. 2d, at 1346.[12]

---

[10] The District Court noted that school boards that had practiced *de jure* segregation are under an affirmative obligation to eliminate the effects of that practice. *Ibid.* See *Columbus Board of Education* v. *Penick*, 443 U. S. 449, 458–459 (1979).

[11] The Court of Appeals therefore did not address the District Court's alternative finding that Initiative 350 had been adopted for discriminatory reasons, or its conclusion that the initiative was overbroad. 633 F. 2d, at 1342.

[12] After the decision on the merits, the District Court had declined to award attorney's fees to the plaintiff School Districts because the Districts are state-funded entities. App. to Juris. Statement C–1. The Court of

The State and various state officers appealed to this Court. We noted probable jurisdiction to address an issue of significance to our Nation's system of education.  454 U. S. 890 (1981).

## II

The Equal Protection Clause of the Fourteenth Amendment guarantees racial minorities the right to full participation in the political life of the community.  It is beyond dispute, of course, that given racial or ethnic groups may not be denied the franchise, or precluded from entering into the political process in a reliable and meaningful manner.  See *White* v. *Regester*, 412 U. S. 755 (1973); *Nixon* v. *Herndon*, 273 U. S. 536 (1927).  But the Fourteenth Amendment also reaches "a political structure that treats all individuals as equals," *Mobile* v. *Bolden*, 446 U. S. 55, 84 (1980) (STEVENS, J., concurring in judgment), yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.

This principle received its clearest expression in *Hunter* v. *Erickson, supra,* a case that involved attempts to overturn antidiscrimination legislation in Akron, Ohio.  The Akron City Council, pursuant to its ordinary legislative processes, had enacted a fair housing ordinance.  In response, the local citizenry, using an established referendum procedure, see 393 U. S., at 390, and n. 6; *id.*, at 393–394, and n. (Harlan, J., concurring), amended the city charter to provide that ordinances regulating real estate transactions " 'on the basis of race, color, religion, national origin or ancestry must first be approved by a majority of the electors voting on the question at a regular or general election before said ordinance shall be

---

Appeals reversed on this issue, concluding that the District Court had abused its discretion in denying fees.  The Court of Appeals determined that the School Districts fell within the language of the attorney's fees statutes, 42 U. S. C. § 1988 and 20 U. S. C. § 3205 (1976 ed., Supp. IV), see n. 31, *infra,* and it reasoned that "[a]s long as a publicly-funded organization advances important constitutional values, it is eligible for fees under the statutes."  633 F. 2d, at 1348.

effective.'" *Id.*, at 387. This action "not only suspended the operation of the existing ordinance forbidding housing discrimination, but also required the approval of the electors before any future [fair housing] ordinance could take effect." *Id.*, at 389–390. In essence, the amendment changed the requirements for the adoption of one type of local legislation: to enact an ordinance barring housing discrimination on the basis of race or religion, proponents had to obtain the approval of the City Council *and* of a majority of the voters citywide. To enact an ordinance preventing housing discrimination on other grounds, or to enact any other type of housing ordinance, proponents needed the support of only the City Council.

In striking down the charter amendment, the *Hunter* Court recognized that, on its face, the provision "draws no distinctions among racial and religious groups." *Id.*, at 390. But it did differentiate "between those groups who sought the law's protection against racial . . . discriminatio[n] in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends," *ibid.*, thus "disadvantag[ing] those who would benefit from laws barring racial . . . discriminatio[n] as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor." *Id.*, at 391. In "reality," the burden imposed by such an arrangement necessarily "falls on the minority. The majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." *Ibid.* In effect, then, the charter amendment served as an "explicitly racial classification treating racial housing matters differently from other racial and housing matters." *Id.*, at 389. This made the amendment constitutionally suspect: "the State may no more disadvantage any *particular* group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Id.*, at 393 (emphasis added).

*Lee* v. *Nyquist*, 318 F. Supp. 710 (WDNY 1970) (three-judge court), offers an application of the *Hunter* doctrine in a setting strikingly similar to the one now before us. That case involved the New York education system, which made use of both elected and appointed school boards and which conferred extensive authority on state education officials. In an effort to eliminate *de facto* segregation in New York's schools, those officials had directed the city of Buffalo—a municipality with an appointed school board—to implement an integration plan. While these developments were proceeding, however, the New York Legislature enacted a statute barring state education officials and appointed—though not elected—school boards from "assign[ing] or compell[ing] [students] to attend any school on account of race . . . or for the purpose of achieving [racial] equality in attendance . . . at any school." *Id.*, at 712.[13]

Applying *Hunter*, the three-judge District Court invalidated the statute, noting that under the provision "[t]he Commissioner [of Education] and local appointed officials are prohibited from acting in [student assignment] matters only where racial criteria are involved." *Id.*, at 719. In the court's view, the statute therefore "place[d] *burdens* on the implementation of educational policies designed to deal with race on the local level" by "treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools." *Ibid.* (emphasis in original). This drew an impermissible distinction "between the treatment of problems involving racial matters and that afforded other problems in the same area." *Id.*, at 718. This Court affirmed the District Court's judgment without opinion. 402 U. S. 935 (1971).

These cases yield a simple but central principle. As Justice Harlan noted while concurring in the Court's opinion in

---

[13] As does Initiative 350, the New York statute apparently permitted voluntary student transfers to achieve integration. See n. 16, *infra*.

*Hunter,* laws structuring political institutions or allocating political power according to "neutral principles"—such as the executive veto, or the typically burdensome requirements for amending state constitutions—are not subject to equal protection attack, though they may "make it more difficult for minorities to achieve favorable legislation." 393 U. S., at 394. Because such laws make it more difficult for *every* group in the community to enact comparable laws, they "provid[e] a just framework within which the diverse political groups in our society may fairly compete." *Id.,* at 393. Thus, the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process. State action of this kind, the Court said, "places *special* burdens on racial minorities within the governmental process," *id.,* at 391 (emphasis added), thereby "making it *more* difficult for certain racial and religious minorities [than for other members of the community] to achieve legislation that is in their interest." *Id.,* at 395 (emphasis added) (Harlan, J., concurring). Such a structuring of the political process, the Court said, was "no more permissible than [is] denying [members of a racial minority] the vote, on an equal basis with others." *Id.,* at 391.

### III

We believe that the Court of Appeals properly focused on *Hunter* and *Lee,* for we find the principle of those cases dispositive of the issue here. In our view, Initiative 350 must fall because it does "not attemp[t] to allocate governmental power on the basis of any general principle." *Hunter v. Erickson,* 393 U. S., at 395 (Harlan, J., concurring). Instead, it uses the racial nature of an issue to define the governmental decisionmaking structure, and thus imposes substantial and unique burdens on racial minorities.

## A

Noting that Initiative 350 nowhere mentions "race" or "integration," appellants suggest that the legislation has no racial overtones; they maintain that *Hunter* is inapposite because the initiative simply permits busing for certain enumerated purposes while neutrally forbidding it for all other reasons. We find it difficult to believe that appellants' analysis is seriously advanced, however, for despite its facial neutrality there is little doubt that the initiative was effectively drawn for racial purposes. Neither the initiative's sponsors, nor the District Court, nor the Court of Appeals had any difficulty perceiving the racial nature of the issue settled by Initiative 350. Thus, the District Court found that the text of the initiative was carefully tailored to interfere only with desegregative busing.[14] Proponents of the initiative candidly "represented that there would be no loss of school district flexibility other than in busing for desegregation purposes." 473 F. Supp., at 1008. And, as we have noted, Initiative 350 in fact allows school districts to bus their students "for most, if not all," of the nonintegrative purposes required by their educational policies. *Id.*, at 1010. The Washington electorate surely was aware of this, for it was "assured" by CiVIC officials that " '99% of the school districts in the state' "—those that lacked mandatory integration programs—"would not be affected by the passage of 350." *Id.*, at 1008–1009. It is beyond reasonable dispute, then, that the initiative was enacted " 'because of,' not merely 'in spite of,' its adverse effects upon" busing for integration. *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279 (1979).

Even accepting the view that Initiative 350 was enacted for such a purpose, the United States—which has changed its position during the course of this litigation, and now supports the State—maintains that busing for integration, unlike the

---

[14] The Court of Appeals accepted the District Court's characterization of the initiative, and even the dissenting judge in the Court of Appeals agreed that Initiative 350 addresses a "racial" problem. 633 F. 2d, at 1353.

fair housing ordinance involved in *Hunter,* is not a peculiarly "racial" issue at all. Brief for United States 17, n. 18. Again, we are not persuaded. It undoubtedly is true, as the United States suggests, that the proponents of mandatory integration cannot be classified by race: Negroes and whites may be counted among both the supporters and the opponents of Initiative 350. And it should be equally clear that white as well as Negro children benefit from exposure to "ethnic and racial diversity in the classroom." *Columbus Board of Education* v. *Penick,* 443 U. S. 449, 486 (1979) (POWELL, J., dissenting). See *Milliken* v. *Bradley,* 418 U. S. 717, 783 (1974) (MARSHALL, J., dissenting).[15] But neither of these factors serves to distinguish *Hunter,* for we may fairly assume that members of the racial majority both favored and benefited from Akron's fair housing ordinance. Cf. *Havens Realty Corp.* v. *Coleman,* 455 U. S. 363, 376–377, and n. 17 (1982); *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 111, 115 (1979).

In any event, our cases suggest that desegregation of the public schools, like the Akron open housing ordinance, at bottom inures primarily to the benefit of the minority, and is designed for that purpose. Education has come to be "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954). When that environment is largely shaped by members of different racial and cultural groups, minority children can achieve their full

---

[15] Appellants and the United States do not challenge the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior *de jure* segregation. We therefore do not specifically pass on that issue. See generally *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16 (1971); *North Carolina State Board of Education* v. *Swann,* 402 U. S. 43, 45 (1971). Cf. *University of California Regents* v. *Bakke,* 438 U. S. 265, 300, n. 39, 312–314 (1978) (opinion of POWELL, J.).

measure of success only if they learn to function in—and are fully accepted by—the larger community. Attending an ethnically diverse school may help accomplish this goal by preparing minority children "for citizenship in our pluralistic society," *Estes* v. *Metropolitan Branches of Dallas NAACP*, 444 U. S. 437, 451 (1980) (POWELL, J., dissenting), while, we may hope, teaching members of the racial majority "to live in harmony and mutual respect" with children of minority heritage. *Columbus Board of Education* v. *Penick*, 443 U. S., at 485, n. 5 (POWELL, J., dissenting). *Lee* v. *Nyquist* settles this point, for the Court there accepted the proposition that mandatory desegregation strategies present the type of racial issue implicated by the *Hunter* doctrine.[16]

It is undeniable that busing for integration—particularly when ordered by a federal court—now engenders considerably more controversy than does the sort of fair housing ordinance debated in *Hunter*. See *Estes* v. *Metropolitan Branches of Dallas NAACP*, 444 U. S., at 448–451 (POWELL,

---

[16] The United States seeks to distinguish *Lee* by suggesting that the statute there at issue "clearly prohibited" all attempts to ameliorate racial imbalance in the schools, while Initiative 350 permits voluntary desegregation efforts. Brief for United States 25. Even assuming that this distinction would otherwise be of constitutional significance, its premise is not accurate. The legislation challenged in *Lee did* permit voluntary integration efforts, for it expressly exempted from its restrictions "the assignment of a pupil in the manner requested or authorized by his parents or guardian." 318 F. Supp., at 712. Thus, as the District Court in *Lee* noted, the statute "denie[d] appointed officials the power to implement *non-voluntary* programs for the improvement of racial balance." *Id.*, at 715 (emphasis added). The difficulty in *Lee*—as in this case—stemmed from the *Lee* District Court's conclusion that a voluntary program would not serve to integrate the community's schools: "Voluntary plans for achieving racial balance . . . have not had a significant impact on the problems of racial segregation in the Buffalo public schools; indeed it would appear that racial isolation is actually increasing." *Ibid.* Thus the statute challenged in *Lee* and Initiative 350 operated in precisely the same way to "deny . . . student[s] the right to attend a fully integrated school." Brief for United States 25.

J., dissenting). But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process. For present purposes, it is enough that minorities may consider busing for integration to be "legislation that is in their interest." *Hunter* v. *Erickson*, 393 U. S., at 395 (Harlan, J., concurring). Given the racial focus of Initiative 350, this suffices to trigger application of the *Hunter* doctrine.

## B

We are also satisfied that the practical effect of Initiative 350 is to work a reallocation of power of the kind condemned in *Hunter*. The initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests. Those favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate. Yet authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board. Indeed, by specifically exempting from Initiative 350's proscriptions most nonracial reasons for assigning students away from their neighborhood schools, the initiative expressly requires those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action. As in *Hunter*, then, the community's political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government.[17] In a very obvious sense, the initiative

---

[17] JUSTICE POWELL finds *Hunter* completely irrelevant, dismissing it with the conclusory statement that "the political system [of Washington] has *not* been redrawn or altered." *Post*, at 498 (emphasis in original). But the dissent entirely fails to address the relevance of *Hunter* to the reallocation of decisionmaking authority worked by Initiative 350. The evil condemned by the *Hunter* Court was not the particular political obstacle of mandatory referenda imposed by the Akron charter amendment; it was,

thus "disadvantages those who would benefit from laws barring" *de facto* desegregation "as against those who . . . would otherwise regulate" student assignment decisions; "the reality is that the law's impact falls on the minority." *Hunter* v. *Erickson*, 393 U. S., at 391.

The state appellants and the United States, in response to this line of analysis, argue that Initiative 350 has not worked *any* reallocation of power. They note that the State necessarily retains plenary authority over Washington's system of education, and therefore they suggest that the initiative

rather, the comparative structural burden placed on the political achievement of minority interests. Thus, in *Hunter*, the procedures for enacting racial legislation were modified in such a way as to place effective control in the hands of the citywide electorate. Similarly here, the power to enact racial legislation has been reallocated. In each case, the effect of the challenged action was to redraw decisionmaking authority over racial matters—and only over racial matters—in such a way as to place comparative burdens on minorities. While JUSTICE POWELL and the United States find it crucial that the proponents of integrated schools remain free to use Washington's initiative system to further their ends, that was true in *Hunter* as well: proponents of open housing were not barred from invoking Akron's initiative procedures to repeal the charter amendment, or to enact fair housing legislation of their own. It surely is an excessively formal exercise, then, to argue that the procedural revisions at issue in *Hunter* imposed special burdens on minorities, but that the selective allocation of decisionmaking authority worked by Initiative 350 does not erect comparable political obstacles. Indeed, *Hunter* would have been virtually identical to this case had the Akron charter amendment simply barred the City Council from passing any fair housing ordinance, as Initiative 350 forbids the use of virtually all mandatory desegregation strategies. Surely, however, *Hunter* would not have come out the other way had the charter amendment made *no* provision for the passage of fair housing legislation, instead of subjecting such legislation to ratification by referendum.

The United States also would note that Initiative 350's "modification of state policy [was] not the result of any unusual political procedure," Brief for United States 30, for initiatives and referenda are often used by the Washington electorate. But that observation hardly serves to distinguish this case from *Hunter*, since the fair housing charter amendment was added through the unexceptional use of Akron's initiative procedure. See 393 U. S., at 387.

amounts to nothing more than an unexceptional example of a State's intervention in its own school system. In effect, they maintain that the State functions as a "super school board," Tr. of Oral Arg. 5, 17, which typically involves itself in all areas of educational policy. And, the argument continues, if the State is the body that usually makes decisions in this area, Initiative 350 worked a simple change in policy rather than a forbidden reallocation of power. Cf. *Crawford* v. *Los Angeles Board of Education, post,* p. 527.

This at first glance would seem to be a potent argument, for States traditionally have been accorded the widest latitude in ordering their internal governmental processes, see *Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60, 71 (1978), and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature. But "insisting that a State may distribute legislative power as it desires . . . furnish[es] no justification for a legislative structure which otherwise would violate the Fourteenth Amendment. Nor does the implementation of this change through popular referendum immunize it." *Hunter* v. *Erickson,* 393 U. S., at 392. The issue here, after all, is not whether Washington has the authority to intervene in the affairs of local school boards; it is, rather, whether the State has exercised that authority in a manner consistent with the Equal Protection Clause. As the Court noted in *Hunter:* "[T]hough Akron might have proceeded by majority vote . . . on all its municipal legislation, it has instead chosen a more complex system. Having done so, the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote." *Id.,* at 392–393.[18] Washington also has chosen

---

[18] Despite the force with which it is written, then, JUSTICE POWELL's essay on "the heretofore unquestioned right of a State to structure the decisionmaking authority of its government," *post,* at 493—as well as his observations on a State's right to repeal programs designed to eliminate *de facto* segregation—is largely beside the point. The State's *power* has not

to make use of a more complex governmental structure, and a close examination both of the Washington statutes and of the Court's decisions in related areas convinces us that *Hunter* is fully applicable here.

At the outset, it is irrelevant that the State might have vested all decisionmaking authority in itself, so long as the political structure it in fact erected imposes comparative burdens on minority interests; that much is settled by *Hunter* and by *Lee*.[19] And until the passage of Initiative 350, Washington law in fact had established the local school board, rather than the State, as the entity charged with making decisions of the type at issue here. Like all 50 States, see Brief for National School Boards Assn. as *Amicus Curiae* 11, 14–16, Washington of course is ultimately responsible for providing education within its borders, see Wash. Const., Art. IX; Wash. Rev. Code § 28A.02.010 (1981); ch. 28A.41 (establishing a uniform school financing system); *Seattle School District No. 1* v. *State*, 90 Wash. 2d 476, 585 P. 2d 71 (1978), and it therefore has set certain procedural requirements and minimum educational standards to be met by each school. See, *e. g.*, §§ 28A.01.010, 28A.01.020 (length of school day and year); ch. 28A.27 (mandatory attendance); ch. 28A.67 (teacher qualifications); ch. 28A.05 and §§ 28A.58.750–28A.58.754 (curriculum). But Washington has chosen to meet its educational responsibilities primarily through "state and local officials, boards, and committees," § 28A.02.020, and the responsibility to devise and tailor educational pro-

---

been questioned at any point during this litigation. The single narrow question before us is whether the State has exercised its power in such a way as to place special, and therefore impermissible, burdens on minority interests.

[19] The Court noted in *Hunter* that Akron "might have proceeded by majority vote . . . on all its municipal legislation," 393 U. S., at 392; the charter amendment was invalidated because the citizens of Akron did not reserve all power to themselves, but rather distributed it in a nonneutral manner. In *Lee*, of course, the State had unquestioned authority to vest all power over education in state officials.

grams to suit local needs has emphatically been vested in the local school boards.

Thus "each common school district board of directors" is made "accountable for the proper operation of [its] district to the local community and its electorate." § 28A.58.758(1). To this end, each school board is "vested with the *final* responsibility for the setting of policies ensuring quality in the content and extent of its educational program" (emphasis added). *Ibid.* School boards are given responsibility for, among many other things, "[e]stablish[ing] performance criteria" for personnel and programs, for assigning staff "according to board enumerated classroom and program needs," for setting requirements concerning hours of instruction, for establishing curriculum standards "relevant to the particular needs of district students or the unusual characteristics of the district," and for evaluating teaching materials. § 28A.58.758(2). School boards are generally directed to "develop a program identifying student learning objectives for their district[s]," § 28A.58.090; see also § 28A.58.092, to select instructional materials, § 28A.58.103, to stock libraries as they deem necessary, § 28A.58.104, and to initiate a variety of optional programs. See, *e. g.,* §§ 28A.34.010, 28A.35.010, 28A.58.105. School boards, of course, are given broad corporate powers. §§ 28A.58.010, 28A.58.075, 28A.59.180. Significantly for present purposes, school boards are directed to determine which students should be bused to school and to provide those students with transportation. § 28A.24.055.

Indeed, the notion of school board responsibility for local educational programs is so firmly rooted that local boards are subject to disclosure and reporting provisions specifically designed to ensure the board's "accountability" to the people of the community for "the educational programs in the school distric[t]." § 28A.58.758(3). And, perhaps most relevant here, before the adoption of Initiative 350 the Washington Supreme Court had found it within the general discretion of

local school authorities to settle problems related to the denial of "equal educational opportunity."[20] *Citizens Against Mandatory Bussing* v. *Palmason*, 80 Wash. 2d 445, 453, 495 P. 2d 657, 663 (1972). It therefore had squarely held that a program of desegregative busing was a proper means of furthering the school board's responsibility to "administe[r] the schools in such a way as to provide a sound education for all children." *Id.*, at 456, 495 P. 2d, at 664.[21] See *State ex rel. Citizens Against Mandatory Bussing* v. *Brooks*, 80 Wash. 2d 121, 492 P. 2d 536 (1972); *State ex rel. Lukens* v. *Spokane School District No. 81*, 147 Wash. 467, 474, 266 P. 189, 191 (1928).[22]

Given this statutory structure, we have little difficulty concluding that Initiative 350 worked a major reordering of the State's educational decisionmaking process. Before adoption of the initiative, the power to determine what programs would most appropriately fill a school district's educational needs—including programs involving student assignment and desegregation—was firmly committed to the local board's

[20] Indeed, even the State's efforts to help ensure equal opportunity in education and to encourage desegregation are cast in cooperative terms, and are designed to assist school districts in implementing programs of their choosing. See, *e. g.*, Wash. Rev. Code §§ 28A.21.010(3), 28A.21.136(1) and (3) (1981); cf. § 28A.58.245(3).

[21] The Washington Supreme Court noted: "[A]s long as the school board authorized or required students to attend schools geographically situated close to their homes, they had such a right. But the right existed only because it was given to them by the school authorities." 80 Wash. 2d, at 452, 495 P. 2d, at 662.

[22] We also note that the State has not attempted to reserve to itself exclusive power to deal with racial issues generally. Municipalities in Washington have been given broad powers of self-government, see generally Wash. Const., Amdt. 40; Wash. Rev. Code §§ 35.22.020, 35.23.440, 35.27.370, 35.30.010 (1981); Wash. Rev. Code, Tit. 35A (Optional Municipal Code), and Washington courts specifically have held that municipalities have the power to enact antidiscrimination ordinances. See, *e. g.*, *Seattle Newspaper-Web Pressmen's Union Local No. 26* v. *Seattle*, 24 Wash. App. 462, 604 P. 2d 170 (1979). Cf. 5 E. McQuillin, Law of Municipal Corporations § 19.23, p. 425 (3d rev. ed. 1981).

discretion. The question whether to provide an integrated learning environment rather than a system of neighborhood schools surely involved a decision of that sort. See *Citizens Against Mandatory Bussing* v. *Palmason*, 80 Wash. 2d, at 459–460, 495 P. 2d, at 666–667. After passage of Initiative 350, authority over all but one of those areas remained in the hands of the local board. By placing power over desegregative busing at the state level, then, Initiative 350 plainly "differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area." *Lee* v. *Nyquist*, 318 F. Supp., at 718.[23] The District Court and the Court of Appeals similarly concluded that the initiative restructured the Washington political process, and we see no reason to challenge the determinations of courts familiar with local law. Cf. *Milliken* v. *Bradley*, 418 U. S., at 769 (WHITE, J., dissenting).

That we reach this conclusion should come as no surprise, for when faced with a similar educational scheme in *Milliken*

---

[23] Throughout his dissent, JUSTICE POWELL insists that the Court has created a "vested constitutional right to local decisionmaking," *post*, at 498–499, that under our holding "the people of the State of Washington apparently are forever barred from developing a different policy on mandatory busing where a school district previously has adopted one of its own," *post*, at 498, n. 14, and that today's decision somehow raises doubts about "the authority of a State to abolish school boards altogether." *Post*, at 494. See also *post*, at 495, and 498–499, n. 14. These statements evidence a basic misunderstanding of our decision. Our analysis vests no rights, and has nothing to do with whether school board action predates that taken by the State. Instead, what we find objectionable about Initiative 350 is the comparative burden it imposes on minority participation in the political process—that is, the racial nature of the way in which it structures the *process* of decisionmaking. It is evident, then, that the horribles paraded by the dissent, *post*, at 498–499, n. 14—which have nothing to do with the ability of minorities to participate in the process of self-government—are entirely unrelated to this case. It is equally clear, as we have noted at several points in our opinion, that the State remains free to vest all decisionmaking power in state officials, or to remove authority from local school boards in a race-neutral manner.

v. *Bradley, supra,*[24] the Court concluded that the actions of a local school board could not be attributed to the State that had created it. We there addressed the Michigan education system, which vests in the State constitutional responsibility for providing education: "'The policy of [Michigan] has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies . . . to carry out the delegated functions given [them] by the legislature.'" *Milliken* v. *Bradley,* 418 U. S., at 794 (MARSHALL, J., dissenting), quoting *School District of City of Lansing* v. *State Board of Education,* 367 Mich. 591, 595, 116 N. W. 2d 866, 868 (1962). See *Milliken* v. *Bradley,* 418 U. S., at 726, n. 5. To fulfill this responsibility, the State of Michigan provided a substantial measure of school district funding, established standards for teacher certification, determined part of the curriculum, set a minimum school term, approved bus routes and textbooks, established disciplinary procedures, and under certain circumstances had the power even to remove local school board members. See *id.,* at 795–796 (MARSHALL, J., dissenting). See also *id.,* at 726, n. 5, 727 (describing state controls over education); *id.,* at 768, and n. 4 (WHITE, J., dissenting) (same); *id.,* at 794 (MARSHALL, J., dissenting) (same).

Yet the Court, noting that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," concluded that the "Michigan educational structure . . . in common with most States, provides for a large measure of local control." *Id.,* at 741–742. Relying on this analysis, the Court determined that a Michigan school board's assignment policies could not be attributed to the State, and therefore declined to permit interdistrict busing as a remedy for one school district's acts of unconstitu-

---

[24] One *amicus* observes that many States employ a similar educational structure. See Brief for National School Boards Assn. as *Amicus Curiae* 11, 14–16, App. 1a–10a.

tional segregation. If local school boards operating under a similar statutory structure are considered separate entities for purposes of constitutional adjudication when they make segregative assignment decisions, it is difficult to see why a different analysis should apply when a local board's *desegregative* policy is at issue.

In any event, we believe that the question here is again settled by *Lee*. There, state control of the educational system was fully as complete as it now is in Washington. See generally N. Y. Educ. Law §§ 305, 306, 308–310 (McKinney 1969 and Supp. 1981). The state statute under attack reallocated power over mandatory desegregation in two ways: it transferred authority from the State Commissioner of Education to local elected school boards, and it shifted authority from local appointed school boards to the state legislature.[25] When presented with this restructuring of the political process, the District Court declared that it could "conceive of no more compelling case for the application of the *Hunter* principle." 318 F. Supp., at 719. This Court of course affirmed the District Court's judgment. We see no relevant distinction between this case and *Lee;* indeed, it is difficult to imagine a more precise parallel.[26]

---

[25] When authority to initiate desegregation programs was removed from appointed school boards and from state education officials, the only body capable of exercising power over such programs was the state legislature.

[26] The United States makes only one attempt to distinguish *Lee* in this regard: *Lee* is inapposite, the United States maintains, because the statute at issue there "blocked desegregation efforts even by 'a school district subject to a pre-existing order to eliminate segregation in its schools,'" and therefore—purportedly in contrast to Initiative 350—"interfere[d] with the efforts of individual school districts to eliminate de jure segregation." Brief for United States 25, quoting *Lee* v. *Nyquist*, 318 F. Supp., at 715. If by this statement the United States seeks to place the District Court's holding and this Court's affirmance in *Lee* on the ground that the New York statute interfered with Buffalo's attempts to eliminate *de jure* segregation, its submission is simply inaccurate. At the time of the *Lee* litigation, Buffalo had *not* been found guilty of practicing intentional segregation. See *Arthur* v. *Nyquist*, 573 F. 2d 134, 137 (CA2 1978). As the

## C

To be sure, "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification." *Crawford* v. *Los Angeles Board of Education, post*, at 539. See *Dayton Board of Education* v. *Brinkman*, 443 U. S. 526, 531, n. 5 (1979); *Hunter* v. *Erickson*, 393 U. S., at 390, n. 5. As Justice Harlan noted in *Hunter*, the voters of the polity may express their displeasure through an established legislative or referendum procedure when particular legislation "arouses passionate opposition." *Id.*, at 395 (concurring opinion). Had Akron's fair housing ordinance been defeated at a referendum, for example, "Negroes would undoubtedly [have lost] an important political battle, but they would not thereby [have been] denied equal protection." *Id.*, at 394.

Initiative 350, however, works something more than the "mere repeal" of a desegregation law by the political entity that created it. It burdens all future attempts to integrate Washington schools in districts throughout the State, by lodging decisionmaking authority over the question at a new and remote level of government. Indeed, the initiative, like the charter amendment at issue in *Hunter*, has its most pernicious effect on integration programs that do *"not* arouse extraordinary controversy." *Id.*, at 396 (emphasis in original). In such situations the initiative makes the enactment of racially beneficial legislation difficult, though the particular program involved might not have inspired opposition had it been promulgated through the usual legislative processes

United States notes, Buffalo was under a "pre-existing order to eliminate segregation in its schools"—but that order was issued by the New York Commissioner of Education, because he had found Buffalo's schools *de facto* segregated. *Appeal of Dixon*, 4 N. Y. Educ. Dept. Reports 115 (1965). See *Lee* v. *Nyquist*, 318 F. Supp., at 714–715. *Lee* did not concern *de jure* segregation; it is to be explained only as a straightforward application of the *Hunter* doctrine.

used for comparable legislation.[27]   This imposes direct and undeniable burdens on minority interests.   "If a governmental institution is to be fair, one group cannot always be expected to win," *id.*, at 394; by the same token, one group cannot be subjected to a debilitating and often insurmountable disadvantage.

## IV

In the end, appellants are reduced to suggesting that *Hunter* has been effectively overruled by more recent decisions of this Court.   As they read it, *Hunter* applied a simple "disparate impact" analysis: it invalidated a facially neutral ordinance because of the law's adverse effects upon racial minorities.   Appellants therefore contend that *Hunter* was swept away, along with the disparate-impact approach to equal protection, in *Washington* v. *Davis*, 426 U. S. 229 (1976), and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977).   Cf. *James* v. *Valtierra*, 402 U. S. 137 (1971).

Appellants unquestionably are correct when they suggest that "purposeful discrimination is 'the condition that offends the Constitution,'" *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S., at 274, quoting *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 16 (1971), for the "central purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race."   *Washington* v. *Davis*, 426 U. S., at 239.   Thus, when facially neutral legislation is subjected to

---

[27] That phenomenon is graphically demonstrated by the circumstances of this litigation.   The longstanding desegregation programs in Pasco and Tacoma, as well as the Seattle middle school integration plan, have functioned for years without creating undue controversy.   Yet they have been swept away, along with the Seattle Plan, by Initiative 350.   As a practical matter, it seems most unlikely that proponents of desegregative busing in smaller communities such as Tacoma or Pasco will be able to obtain the statewide support now needed to permit them to desegregate the schools in their communities.

equal protection attack, an inquiry into intent is necessary to determine whether the legislation in some sense was designed to accord disparate treatment on the basis of racial considerations. Appellants' suggestion that this analysis somehow conflicts with *Hunter*, however, misapprehends the basis of the *Hunter* doctrine. We have not insisted on a particularized inquiry into motivation in all equal protection cases: "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S., at 272. And legislation of the kind challenged in *Hunter* similarly falls into an inherently suspect category.[28]

There is one immediate and crucial difference between *Hunter* and the cases cited by appellants. While decisions such as *Washington* v. *Davis* and *Arlington Heights* considered classifications facially unrelated to race, the charter amendment at issue in *Hunter* dealt in explicitly racial terms with legislation designed to benefit minorities "as minorities," not legislation intended to benefit some larger group of underprivileged citizens among whom minorities were disproportionately represented. This does not mean, of course, that every attempt to address a racial issue gives rise to an impermissible racial classification. See *Crawford* v. *Los Angeles Board of Education, post*, p. 527. But when the political process or the decisionmaking mechanism used to address racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the governmental action plainly "rests on 'distinctions based on race.'"[29] *James* v. *Valtierra*, 402 U. S., at

---

[28] The State does not suggest that Initiative 350 furthers the kind of compelling interest necessary to overcome the strict scrutiny applied to explicit racial classifications.

[29] Thus we do not hold, as the dissent implies, *post*, at 494, that the State's attempt to repeal a desegregation program creates a racial classification, while "identical action" by the Seattle School Board does not. It is

141, quoting *Hunter* v. *Erickson*, 393 U. S., at 391. And when the State's allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the "special condition" of prejudice, the governmental action seriously "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities." *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938). In a most direct sense, this implicates the judiciary's special role in safeguarding the interests of those groups that are "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973).[30]

*Hunter* recognized the considerations addressed above, and it therefore rested on a principle that has been vital for over a century—that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." 393 U. S., at 391. Just such distinctions infected the reallocation of decisionmaking authority considered in *Hunter*, for minorities are no less powerless with the vote than without it when a racial criterion is used to assign governmental power in such a way as to exclude particular racial groups "from effective participation in the political proces[s]." *Mobile* v. *Bolden*, 446 U. S., at 94 (WHITE, J., dissenting). Certainly, a state requirement that "desegregation or antidiscrimination laws," *Crawford* v. *Los Angeles Board of Education, post*, at 539, and only such

the State's race-conscious restructuring of its decisionmaking process that is impermissible, not the simple repeal of the Seattle Plan.

[30] We also note that singling out the political processes affecting racial issues for uniquely disadvantageous treatment inevitably raises dangers of impermissible motivation. When political institutions are more generally restructured, as JUSTICE BRENNAN has noted in another context, "[t]he very breadth of [the] scheme . . . negates any suggestion" of improper purpose. *Walz* v. *Tax Comm'n*, 397 U. S. 664, 689 (1970) (concurring opinion).

laws, be passed by unanimous vote of the legislature would be constitutionally suspect. It would be equally questionable for a community to require that laws or ordinances "designed to ameliorate race relations or to protect racial minorities," *ibid.*, be confirmed by popular vote of the electorate as a whole, while comparable legislation is exempted from a similar procedure. The amendment addressed in *Hunter*—and, as we have explained, the legislation at issue here—was less obviously pernicious than are these examples, but was no different in principle.

## V

In reaching this conclusion, we do not undervalue the magnitude of the State's interest in its system of education. Washington could have reserved to state officials the right to make all decisions in the areas of education and student assignment. It has chosen, however, to use a more elaborate system; having done so, the State is obligated to operate that system within the confines of the Fourteenth Amendment. That, we believe, it has failed to do.[31]

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

---

[31] Appellants also challenge the Court of Appeals' award of attorney's fees to the School District plaintiffs, see n. 12, *supra*, arguing that state-funded entities are not eligible to receive such awards from the State. In our view, this contention is without merit. The Districts are plainly parties covered by the language of the fees statutes. See 42 U. S. C. § 1988 (1976 ed., Supp. IV) ("In any action . . . to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow *the prevailing party, other than the United States*, a reasonable attorney's fee as part of its costs") (emphasis added); 20 U. S. C. § 3205 (1976 ed., Supp. IV) ("Upon the entry of a final order by a court of the United States against a . . . State . . . for failure to comply with . . . the fourteenth amendment to the Constitution of the United States as [it] pertain[s] to elementary and secondary education, the court, in its discretion . . . may allow *the prevailing party, other than the United States*, a reasonable attorney's fee as part of its costs") (emphasis added). Nothing in the history of the statutes suggests that this language was meant to exclude

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The people of the State of Washington, by a two-to-one vote, have adopted a neighborhood school policy. The policy is binding on local school districts but in no way affects the authority of state or federal courts to order school transportation to remedy violations of the Fourteenth Amendment. Nor does the policy affect the power of local school districts to establish voluntary transfer programs for racial integration or for any other purpose.

In the absence of a constitutional violation, no decision of this Court compels a school district to adopt or maintain a mandatory busing program for racial integration.[1] Accordingly, the Court does not hold that the adoption of a neighborhood school policy by *local* school districts would be unconstitutional. Rather, it holds that the adoption of such a

---

state-funded entities. To the contrary, the Courts of Appeals have held with substantial unanimity that publicly funded legal services organizations may be awarded fees. See, *e. g.*, *Dennis* v. *Chang*, 611 F. 2d 1302 (CA9 1980); *Holley* v. *Lavine*, 605 F. 2d 638 (CA2 1979), cert. denied *sub nom. Blum* v. *Holley*, 446 U. S. 913 (1980); *Lund* v. *Affleck*, 587 F. 2d 75 (CA1 1978). And when it enacted § 1988, Congress cited with approval a decision awarding fees to a state-funded organization. See H. R. Rep. No. 94–1558, p. 8, n. 16 (1976) (citing *Incarcerated Men of Allen County Jail* v. *Fair*, 507 F. 2d 281 (CA6 1974). In any event, the underlying congressional policies are served by awarding fees in cases such as the one before us: no matter what the source of their funds, school boards have limited budgets, and allowing them fees "encourage[s] compliance with and enforcement of the civil rights laws." *Dennis* v. *Chang*, 611 F. 2d, at 1306. See *id.*, at 1306–1307. While appellants suggest that it is incongruous for a State to pay attorney's fees to one of its school boards, it seems no less incongruous that a local board would feel the need to sue the State for a violation of the Fourteenth Amendment. We see no reason to disturb the judgment of the Court of Appeals on this point.

[1] Throughout this dissent, I use the term "mandatory busing" to refer to busing—or mandatory student reassignments—for the purpose of achieving racial integration.

policy at the *state* level—rather than at the local level—violates the Equal Protection Clause of the Fourteenth Amendment.

I dissent from the Court's unprecedented intrusion into the structure of a state government. The School Districts in this case were under no federal constitutional obligation to adopt mandatory busing programs. The State of Washington, the governmental body ultimately responsible for the provision of public education, has determined that certain mandatory busing programs are detrimental to the education of its children. "[T]he Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches." *Hughes* v. *Superior Court,* 339 U. S. 460, 467 (1950). In my view, that Amendment leaves the States equally free to decide matters of concern to the State at the state, rather than local, level of government.

## I

At the November 1978 general election, the voters of the State adopted Initiative 350 by a two-to-one majority.[2] The Initiative sets forth a neighborhood school policy binding on local school districts. It establishes a general rule prohibiting school districts from "directly or indirectly requir[ing] any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence." Wash. Rev. Code § 28A.26.010 (1981). The rule may be avoided in individual instances only if the student requires special education; if there are health or safety hazards between the student's residence and the nearest or next

---

[2] The Initiative passed by almost 66% of the statewide vote. In Seattle the Initiative passed by over 61% of the vote. It failed in only two of Seattle's legislative districts—one predominantly black and one predominantly white.

nearest school; or if the nearby schools are overcrowded, unsafe, or lacking in physical facilities. *Ibid.*

The Initiative includes two significant limitations upon the scope of its neighborhood school policy. It expressly provides that nothing in the Initiative shall "preclude the establishment of schools offering specialized or enriched educational programs which students may voluntarily choose to attend, or of any other voluntary option offered to students." § 28A.26.050. Moreover, and critical to this case, the authority of state and federal courts to order mandatory school assignments to remedy constitutional violations is left untouched by the Initiative: "This chapter shall not prevent any court of competent jurisdiction from adjudicating constitutional issues relating to the public schools." § 28A.26.060.[3]

This suit was filed in United States District Court shortly after the Initiative was enacted. The Seattle School District, joined by the Tacoma and Pasco School Districts[4] and certain individual plaintiffs, argued that the Initiative violated the Equal Protection Clause of the Fourteenth Amendment. The District Court agreed, and, in a split decision, the Court of Appeals affirmed. Relying on *Hunter* v. *Erickson*, 393 U. S. 385 (1969), the Court of Appeals concluded that Initiative 350 "both creates a constitutionally-suspect racial classification and radically restructures the po-

---

[3] Unlike the constitutional amendment at issue in *Crawford* v. *Los Angeles Board of Education, post,* p. 527, Initiative 350 places no limits on the state courts in their interpretation of the State Constitution. Thus, if mandatory school assignments were required by the State Constitution—although not by the Fourteenth Amendment of the Federal Constitution—Initiative 350 would not hinder a State from enforcing its Constitution.

[4] Tacoma School District No. 10 and Pasco School District No. 1 are the only other school districts in Washington with extensive integration programs. Pasco has relied upon school closings and mandatory busing to achieve racial integration in its schools. Only minority children are bused under the Pasco plan. 473 F. Supp. 996, 1002 (WD Wash. 1979). In addition to school closings, the Tacoma integration plan relies upon voluntary techniques—magnet schools and voluntary transfers.

litical process of Washington by allowing a state-wide majority to usurp traditional local authority over local school board educational policies." 633 F. 2d 1338, 1344 (CA9 1980).[5]

## II

The principles that should guide us in reviewing the constitutionality of Initiative 350 are well established. To begin with, we have never held, or even intimated, that absent a federal constitutional violation, a State *must* choose to treat persons differently on the basis of race. In the absence of a federal constitutional violation requiring race-specific remedies, a policy of strict racial neutrality by a State would violate no federal constitutional principle. Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978).

In particular, a neighborhood school policy and a decision *not* to assign students on the basis of their race, does not offend the Fourteenth Amendment.[6] The Court has never

---

[5] Judge Wright dissented. In his view Initiative 350 could not be said to embody a racial classification. The Initiative does not classify individuals on the basis of their race. It simply deals with a matter bearing on race relations. Moreover, no racial classification is created because the citizens of a State favor mandatory school reassignments for some purposes but not for reasons of race. The benefits and problems associated with busing for one reason—*e. g.*, for racial integration—are not the same as for another— *e. g.*, to avoid safety hazards. Finally, Judge Wright could not understand how the exercise of authority by the State could create a racial classification. The State had not intervened by altering the legislative process in a way that burdened racial minorities. Charged by the State Constitution with the responsibility for the provision of public education, the State had simply exercised its authority to run its own school system.

Judge Wright also addressed the District Court's alternative holdings that Initiative 350 is overbroad or that it was motivated by discriminatory intent. He found no basis for either conclusion. These alternative holdings were not addressed by the Court of Appeals majority. Nor are they relied upon by the Court today. Accordingly, they are not discussed in this dissent.

[6] See *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 28 (1971) ("Absent a constitutional violation there would be no basis for

held that there is an affirmative duty to integrate the schools in the absence of a finding of unconstitutional segregation. See *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 24 (1971); *Dayton Board of Education* v. *Brinkman*, 433 U. S. 406, 417 (1977). Certainly there is no constitutional duty to adopt mandatory busing in the absence of such a violation. Indeed, even where desegregation is ordered because of a constitutional violation, the Court has never held that racial balance itself is a constitutional requirement. *Ibid.* And even where there have been segregated schools, once desegregation has been accomplished no further constitutional duty exists upon school boards or States to maintain integration. See *Pasadena City Board of Education* v. *Spangler*, 427 U. S. 424 (1976).

Moreover, it is a well-established principle that the States have "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them." *Holt Civic Club* v. *Tuscaloosa*, 439 U. S. 60, 71 (1978).[7] The Constitution does not dictate to the States a

---

judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes").

Indeed, in the absence of a finding of segregation by the School District, mandatory busing on the basis of race raises constitutional difficulties of its own. Extensive pupil transportation may threaten liberty or privacy interests. See *University of California Regents* v. *Bakke*, 438 U. S. 265, 300, n. 39 (1978) (opinion of POWELL, J.); *Keyes* v. *School District No. 1, Denver, Colo.*, 413 U. S. 189, 240–250 (1973) (POWELL, J., concurring in part and dissenting in part). Moreover, when a State or school board assigns students on the basis of their race, it acts on the basis of a racial classification, and we have consistently held that "[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 272 (1979).

[7] "[A]ccording to the institutions of this country, the sovereignty in every State resides in the people of the State, and . . . they may alter and change their form of government at their own pleasure." *Luther* v. *Borden*, 7 How. 1, 47 (1849). See *Community Communications Co.* v.

particular division of authority between legislature and judiciary or between state and local governing bodies. It does not define institutions of local government.

Thus, a State may choose to run its schools from the state legislature or through local school boards just as it may choose to address the matter of race relations at the state or local level. There is no constitutional requirement that the State establish or maintain local institutions of government or that it delegate particular powers to these bodies. The only relevant constitutional limitation on a State's freedom to order its political institutions is that it may not do so in a fashion designed to "plac[e] *special* burdens on racial minorities within the governmental process." *Hunter* v. *Erickson*, 393 U. S., at 391 (emphasis added).

In sum, in the absence of a prior constitutional violation, the States are under no constitutional duty to adopt integration programs in their schools, and certainly they are under no duty to establish a regime of mandatory busing. Nor does the Federal Constitution require that particular decisions concerning the schools or any other matter be made on the local as opposed to the state level. It does not require the States to establish local governmental bodies or to delegate unreviewable authority to them.

## III

Application of these settled principles demonstrates the serious error of today's decision—an error that cuts deeply into the heretofore unquestioned right of a State to structure the decisionmaking authority of its government. In this case, by

---

*Boulder*, 455 U. S. 40, 53–54 (1982); *Sailors* v. *Board of Education*, 387 U. S. 105, 109 (1967) ("Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs"); *United States* v. *Kagama*, 118 U. S. 375, 379 (1886) (under the Constitution, sovereign authority resides either with the States or the Federal Government, and "[t]here exist . . . but these two").

Initiative 350, the State has adopted a policy of racial neutrality in student assignments. The policy in no way interferes with the power of state or federal courts to remedy constitutional violations. And if such a policy had been adopted by any of the School Districts in this litigation there could have been no question that the policy was constitutional.[8]

The issue here arises only because the Seattle School District—in the absence of a then-established state policy—chose to adopt race-specific school assignments with extensive busing. It is not questioned that the District itself, at any time thereafter, could have changed its mind and canceled its integration program without violating the Federal Constitution. Yet this Court holds that neither the legislature nor the people of the State of Washington could alter what the District had decided.

The Court argues that the people of Washington by Initiative 350 created a racial classification, and yet must agree that identical action by the Seattle School District itself would have created no such classification. This is not an easy argument to answer because it seems to make no sense. School boards are the creation of supreme state authority, whether in a State Constitution or by legislative enactment. Until today's decision no one would have questioned the authority of a State to abolish school boards altogether, or to require that they conform to any lawful state policy. And in the State of Washington, a neighborhood school policy would have been lawful.

Under today's decision this heretofore undoubted supreme authority of a State's electorate is to be curtailed whenever a school board—or indeed any other state board or local instrumentality—adopts a race-specific program that arguably benefits racial minorities. Once such a program is adopted,

---

[8] The Court consistently has held that "the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place." *Crawford* v. *Los Angeles Board of Education, post,* at 538.

*only* the local or subordinate entity that approved it will have authority to change it. The Court offers no authority or relevant explanation for this extraordinary subordination of the ultimate sovereign power of a State to act with respect to racial matters by subordinate bodies. It is a strange notion—alien to our system—that local governmental bodies can forever pre-empt the ability of a State—the sovereign power—to address a matter of compelling concern to the State. The Constitution of the United States does not require such a bizarre result.

This is certainly not a case where a State—in moving to change a locally adopted policy—has established a racially discriminatory requirement. Initiative 350 does not impede enforcement of the Fourteenth Amendment. If a Washington school district should be found to have established a segregated school system, Initiative 350 will place no barrier in the way of a remedial busing order. Nor does Initiative 350 authorize or approve segregation in any form or degree. It is neutral on its face, and racially neutral as public policy. Children of all races benefit from neighborhood schooling, just as children of all races benefit from exposure to "'ethnic and racial diversity in the classroom.'" *Ante,* at 472, quoting *Columbus Board of Education* v. *Penick,* 443 U. S. 449, 486 (1979) (POWELL, J., dissenting).[9]

Finally, Initiative 350 places no "special burdens on racial minorities within the governmental process," *Hunter* v.

---

[9] The policies in support of neighborhood schooling are various but all of them are racially neutral. The people of the State legitimately could decide that unlimited mandatory busing places too great a burden on the liberty and privacy interests of families and students of all races. It might decide that the reassignment of students to distant schools, on the basis of race, was too great a departure from the ideal of racial neutrality in state action. And, in light of the experience with mandatory busing in other cities, the State might conclude that such a program ultimately would lead to greater racial imbalance in the schools. See *Estes* v. *Metropolitan Branches of Dallas NAACP,* 444 U. S. 437, 451 (1980) (POWELL, J., dissenting).

*Erickson, supra,* at 391, such that interference with the State's distribution of authority is justified. Initiative 350 is simply a reflection of the State's political process at work. It does not alter that process in any respect. It does not require, for example, that all matters dealing with race— or with integration in the schools—must henceforth be submitted to a referendum of the people. Cf. *Hunter* v. *Erickson, supra.* The State has done no more than precisely what the Court has said that it should do: It has "resolved through the political process" the "desirability and efficacy of [mandatory] school desegregation" where there has been no unlawful segregation. *Ante,* at 474.

The political process in Washington, as in other States, permits persons who are dissatisfied at a local level to appeal to the state legislature or the people of the State for redress. It permits the people of a State to pre-empt local policies, and to formulate new programs and regulations. Such a process is inherent in the continued sovereignty of the States. This is our system. Any time a State chooses to address a major issue some persons or groups may be disadvantaged. In a democratic system there are winners and losers. But there is no inherent unfairness in this and certainly no constitutional violation.[10]

## IV

Nonetheless, the Court holds that Initiative 350 "imposes substantial and unique burdens on racial minorities" in the governmental process. See *ante,* at 470. Its authority for

---

[10] Cf. *James* v. *Valtierra,* 402 U. S. 137, 142 (1971) ("[O]f course a lawmaking procedure that 'disadvantages' a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group. And this Court would be required to analyze governmental structures to determine whether a gubernatorial veto provision or a filibuster rule is likely to 'disadvantage' any of the diverse and shifting groups that make up the American people").

this holding is said to be *Hunter* v. *Erickson, supra.*[11] In *Hunter* the people of Akron passed a charter amendment that "not only suspended the operation of the existing ordinance forbidding housing discrimination, but also required the approval of the electors before any future [antidiscrimination] ordinance could take effect." 393 U. S., at 389–390. Although the charter amendment was facially neutral, the Court found that it could be said to embody a racial classification: "[T]he reality is that the law's impact falls on the minority. The majority needs no protection against discrimination." *Id.*, at 391. By making it more difficult to pass legislation in favor of racial minorities, the amendment placed "special burdens on racial minorities within the governmental process." *Ibid.*

Nothing in *Hunter* supports the Court's extraordinary invasion into the State's distribution of authority. Even could it be assumed that Initiative 350 imposed a burden on racial minorities,[12] it simply does not place unique political obstacles in the way of racial minorities. In this case, unlike in

---

[11] The Court also relies at certain critical points in its discussion on the summary affirmance in *Lee* v. *Nyquist*, 318 F. Supp. 710 (WDNY 1970), summarily aff'd, 402 U. S. 935 (1971). As we have often noted, however, summary affirmances by this Court are of little precedential force. See *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 500 (1981). A summary affirmance "is not to be read as an adoption of the reasoning supporting the judgment under review." *Zobel* v. *Williams*, 457 U. S. 55, 64, n. 13 (1982).

[12] It is far from clear that in the absence of a constitutional violation, mandatory busing necessarily benefits racial minorities or that it is even viewed with favor by racial minorities. See *Crawford* v. *Los Angeles Board of Education, post*, at 545, n. 32. As the Court indicates, the busing question is complex and is best resolved by the political process. *Ante*, at 474.

Moreover, it is significant that Initiative 350 places no limits on voluntary programs or on court-ordered reassignments. It permits school districts to order school closings for purposes of racial balance. § 28A.26.030. And it permits school districts to order a student to attend the "next nearest"—rather than nearest—school to promote racial integration.

*Hunter*, the political system has *not* been redrawn or altered. The authority of the State over the public school system, acting through initiative or the legislature, is plenary. Thus, the State's political system is not altered when it adopts for the first time a policy, concededly within the area of its authority, for the regulation of local school districts. And certainly racial minorities are not uniquely or comparatively burdened by the State's adoption of a policy that would be lawful if adopted by any school district in the State.[13]

*Hunter*, therefore, is simply irrelevant. It is the *Court* that by its decision today disrupts the normal course of State government.[14] Under its unprecedented theory of a vested

---

[13] The Court repeatedly states that the effect of Initiative 350 is "to redraw decisionmaking authority over racial matters—*and only over racial matters*—in such a way as to place *comparative* burdens on minorities." *Ante*, at 475, n. 17 (emphasis added). But the decision by the State to exercise its authority over the schools and over racial matters in the schools does not place a comparative burden on racial minorities. In *Hunter*, as we have understood it, "fair housing legislation *alone* was subject to an automatic referendum requirement." *Gordon* v. *Lance*, 403 U. S. 1, 5 (1971) (emphasis added). By contrast, Initiative 350 merely places mandatory busing among the much larger group of matters—covering race relations, administration of the schools, and a variety of other matters—addressed at the state level. See n. 15, *infra*. Racial minorities, if indeed they are burdened by Initiative 350, are not *comparatively* burdened. In this respect, they are in the same position as any other group of persons who are disadvantaged by regulations drawn at the State level.

[14] The Court's decision intrudes deeply into normal state decisionmaking. Under its holding the people of the State of Washington apparently are forever barred from developing a different policy on mandatory busing where a school district previously has adopted one of its own. This principle would not seem limited to the question of mandatory busing. Thus, if the admissions committee of a state law school developed an affirmative-action plan that came under fire, the Court apparently would find it unconstitutional for any higher authority to intervene unless that authority traditionally dictated admissions policies. As a constitutional matter, the dean of the law school, the faculty of the university as a whole, the university president, the chancellor of the university system, and the board of

constitutional right to local decisionmaking, the State apparently is now forever barred from addressing the perplexing problems of how best to educate fairly *all* children in a multiracial society where, as in this case, the local school board has acted first.[15]

regents might be powerless to intervene despite their greater authority under state law.

After today's decision it is unclear whether the State may set policy in any area of race relations where a local governmental body arguably has done "more" than the Fourteenth Amendment requires. If local employment or benefits are distributed on a racial basis to the benefit of racial minorities, the State apparently may not thereafter ever intervene. Indeed, under the Court's theory one must wonder whether—under the equal protection component of the Fifth Amendment—even the Federal Government could assert its superior authority to regulate in these areas.

[15] Even accepting the dubious notion that a State must demonstrate some past control over public schooling or race relations before now intervening in these matters, *ante,* at 477, the Court's attempt to demonstrate that Initiative 350 represents a unique thrust by the State into these areas is unpersuasive. The Court's own discussion indicates the comprehensive character of the State's activity. The Common School Provisions of the State's Code of Laws are nearly 200 pages long, governing a broad variety of school matters. The State has taken seriously its constitutional obligation to provide public education. See Wash. Const., Art. IX, § 2; *Seattle School District No. 1* v. *State,* 90 Wash. 2d 476, 518, 585 P. 2d 71, 95 (1978). In light of the wide range of regulation of the public schools by the State, it is wholly unclear what degree of prior concern or control by the State would satisfy the Court's new doctrine.

In addition to public school affairs generally, the State has taken a direct interest in ending racial discrimination in the schools and elsewhere. See Wash. Rev. Code § 49.60.010 *et seq.* (1981). Article IX, § 1, of the State Constitution specifically prohibits discrimination in public schools: "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders without distinction or preference on account of race, color, caste, or sex." The State Supreme Court has not interpreted this section of the State Constitution to prohibit race-conscious school assignments in the absence of a violation of the Fourteenth Amendment. Cf. *Citizens Against Mandatory Bussing* v. *Palmason,* 80 Wash. 2d 445, 495 P. 2d 657 (1972). But until today's decision one would have

500

## V

We are not asked to decide the wisdom of a state policy that limits the ability of local school districts to adopt—on their own volition—mandatory reassignments for racial balance. We must decide only whether the Federal Constitution permits the State to adopt such a policy. The School Districts in this case were under no federal constitutional obligation to adopt mandatory busing. Absent such an obligation, the State—exercising its sovereign authority over all subordinate agencies—should be free to reject this debatable restriction on liberty. But today's decision denies this right to a State. In this case, it deprives the State of Washington of all opportunity to address the unresolved questions resulting from extensive mandatory busing.[16] The Constitution does not dictate to the States at what level of government de-

---

thought that the state court *could* have rendered such a decision without violating the Federal Constitution.

[16] Responding to this dissent, the Court denies that its opinion limits the authority of the people of the State of Washington and the legislature to control or regulate school boards. It further states that "the State remains free to vest all decisionmaking power in state officials, or to remove authority from local school boards in a race-neutral manner." *Ante*, at 480, n. 23. These are puzzling statements that seem entirely at odds with much of the text of the Court's opinion. It will be surprising if officials of the State of Washington—with the one exception mentioned below—will have any clear idea as to what the State now lawfully may do.

The Court does say that "[i]t is the State's race-conscious restructuring of its decisionmaking process that is impermissible, not the simple repeal of the Seattle Plan." *Ante*, at 485–486, n. 29. Apparently the Court is saying that, despite what else may be said in its opinion, the people of the State—or the state legislature—may repeal the *Seattle Plan*, even though neither the people nor the legislature validly may prescribe statewide standards. I perceive no logic in—and certainly no constitutional basis for—a distinction between repealing the Seattle Plan of mandatory busing and establishing a statewide policy to the same effect. The people of a State have far greater interest in the general problems associated with compelled busing for the purpose of integration than in the plan of a single school board.

cisions affecting the public schools must be taken. It certainly does not strip the States of their sovereignty. It therefore does not authorize today's intrusion into the State's internal structure.[17]

---

[17] As a former school board member for many years, I accept the privilege of a dissenting Justice to add a personal note. In my view, the local school board—responsible to the people of the district it serves—*is* the best qualified agency of a state government to make decisions affecting education within its district. As a policy matter, I would not favor reversal of the Seattle Board's decision to experiment with a reasonable mandatory busing program, despite my own doubts as to the educational or social merit of such a program. See *Estes* v. *Metropolitan Branches of Dallas NAACP*, 444 U. S., at 438–448 (POWELL, J., dissenting). But this case does not present a question of educational policy or even the merits of busing for racial integration. The question is one of a State's sovereign authority to structure and regulate its own subordinate bodies...