[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11009
_____

D.C. Docket No. 2:16-cv-00690-RDP

MARNIKA LEWIS,
ANTOIN ADAMS,
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE,
GREATER BIRMINGHAM MINISTRIES,
MARIKA COLEMAN,
JOHN ROGERS,
PRISCILLA DUNN,
JUANDALYNN GIVAN,
LOUISE ALEXANDER,
WILLIAM MUHAMMAD,
RODGER SMITHERMAN,
OLIVER ROBINSON,
ALABAMA LEGISLATIVE BLACK CAUCUS,
MARY MOORE,

Plaintiffs - Appellants,

versus

GOVERNOR OF ALABAMA,
in his Official Capacity as Governor of the State of Alabama,
ATTORNEY GENERAL, STATE OF ALABAMA,
in his Official Capacity as Attorney General of the State of Alabama,
STATE OF ALABAMA, THE,

BIRMINGHAM, CITY OF, THE,
WILLIAM A. BELL, SR.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 25, 2018)

Before WILSON and JORDAN, Circuit Judges, and CONWAY,[*] District Judge.

WILSON, Circuit Judge:

For a single day in February 2016, Marnika Lewis and Antoin Adams secured a pay raise. The Mayor of Birmingham, Alabama, William Bell, had just affixed his signature to Birmingham Ordinance No. 16-28, which guaranteed Lewis, Adams, and all other wage earners in the city $10.10 per hour. But the following afternoon, Alabama Governor Robert Bentley signed the Minimum Wage and Right-to-Work Act (The Minimum Wage Act or the Act) into law. The Minimum Wage Act nullified Birmingham Ordinance No. 16-28, preempted all local labor and employment regulation, and mandated a uniform minimum wage throughout Alabama—which, then and now, sits at $7.25 per hour. At the heart of this appeal is whether Lewis and Adams have stated a plausible claim that the

_____

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

Minimum Wage Act had the purpose and effect of discriminating against Birmingham's black citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment. Because they have, we reverse the dismissal of that claim. We affirm the dismissal of all other claims.

I.

The events giving rise to this proceeding began in April 2015, when the Birmingham City Council passed a resolution calling upon the state legislature to raise the minimum wage to $10 per hour across Alabama. At that time, no Alabama municipality had a minimum wage above the federal floor of $7.25. *See* 29 U.S.C. § 206(a)(1)(C). After the state refused the city's request, the city council adopted its own minimum wage law that August. The unanimous ordinance, which was scheduled to take effect in July 2016, raised the minimum wage to $8.50 per hour, and to $10.10 in 2017. The ordinance declared the need "to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost [Birmingham's] economy." Birmingham, the largest city in Alabama, has more total residents living in poverty (30% of its citizens) than anywhere else in the state.[1] The city is also home to the largest black population in Alabama (72%), which is reflected in the racial composition of its city council.

---

[1] All census data is derived from *Quick Facts: Birmingham City, Alabama*; *Mountain Brook City, Alabama*, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/ birminghamcityalabama,mountainbrookcityalabama/PST045216.

About a week after the ordinance's approval, a white state representative from the neighboring community of Mountain Brook (where only 1.5% of residents are black and just 3% of residents live below the poverty line) introduced a bill in the Alabama House of Representatives designed to quash Birmingham's ordinance and establish a uniform minimum wage throughout the state. The bill stalled, but at the start of the 2016 session, a variation of the bill (now called HB 174) was introduced by the same representative, this time with the support of fifty-two additional sponsors, all of whom were white.

Things progressed quickly. Within a week of its introduction on February 9, 2016, HB 174 sailed through the House Committee on State Government and won the approval of a majority of the House, 71-31. No black member of the House voted in favor of the bill. Thirty-six hours later, the bill cleared the Alabama Senate Committee on Governmental Affairs and was on its way to the Senate floor.

Meanwhile, the Birmingham City Council moved to accelerate the implementation of its own minimum wage law. On February 23, it adopted Ordinance No. 16-28, raising the minimum wage for Birmingham workers to $10.10 per hour, adjusted annually, effective immediately. Mayor Bell signed it into law the following day. Notice of the new minimum wage was slated for publication in the Sunday edition of the *Birmingham News*.

4

But on February 25, just a day after Birmingham raised its minimum wage, the Alabama Senate approved the Minimum Wage Act, 23-12, rendering Ordinance No. 16-28 null and void.  The Act lacked support from any black senators.  Governor Bentley signed it into law less than two hours later.

The Minimum Wage Act, codified at Alabama Code §§ 25-7-40 et seq., "establish[es] within the Legislature complete control over regulation and policy pertaining to collective bargaining . . . or the wages, leave, or other employment benefits provided by an employer to an employee . . . in order to ensure that such regulation and policy is applied uniformly throughout the state." *Id.* § 25-7-45(a). To that end, the Act "occupies and preempts the entire field of regulation" in these areas "to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any . . . political subdivision of th[e] state." *Id.* § 25-7-45(b).

A few months after the Alabama Legislature passed the Minimum Wage Act, Lewis and Adams—who live in Birmingham and make less than $10.10 per hour—along with several public interest groups, sued the Governor and the Attorney General of Alabama, claiming racial discrimination under multiple theories.  The plaintiffs amended their complaint to include claims under the Thirteenth, Fourteenth, and Fifteenth Amendments and § 2 of the Voting Rights Act.  They also added the State of Alabama, the City of Birmingham, and

5

Birmingham Mayor William Bell as defendants, while dropping the governor from the suit.  The defendants moved to dismiss for lack of standing and failure to state a claim.

The district court agreed with the defendants and dismissed the complaint.  It concluded that the plaintiffs lacked Article III standing to sue any of the defendants; that the attorney general was an improper defendant under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908); that § 2 of the Voting Rights Act did not abrogate Eleventh Amendment state sovereign immunity; and that, in any event, the plaintiffs had failed to assert any plausible claims.  The plaintiffs now appeal the dismissal of their Fourteenth and Fifteenth Amendment claims against the attorney general and the City of Birmingham,[2] and their Voting Rights Act claim against the State of Alabama.

## II.

We review both subject matter jurisdiction and Eleventh Amendment sovereign immunity issues de novo.  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1333–34 (11th Cir. 1999).  Likewise, we review the grant of a Rule 12(b)(6) motion to dismiss de novo, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).  "'[W]hen standing becomes an issue

---

[2] The plaintiffs do not challenge the dismissal of the Mayor of Birmingham on appeal.

6

on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing.'" *Moody v. Warden*, 887 F.3d 1281, 1286 (11th Cir. 2018) (quoting *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000)).

## III.

## A.

We begin, as we must, by addressing whether the plaintiffs have standing to sue each of the defendants for each of the claims asserted. *See Jackson v. Okaloosa Cty., Fla.*, 21 F.3d 1531, 1536 (11th Cir. 1994). This is a threshold requirement that "springs from the nature and limits of the judicial power of the United States." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S. Ct. 1003, 1012 (1998) (alteration adopted). If the plaintiffs lack standing, "the 'case' or 'controversy' requirement of Article III, § 2 of the U.S. Constitution is not satisfied, and the case must be dismissed." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). The plaintiffs must show: (1) that they have suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection, so that the injury is fairly

traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61, 112 S. Ct. at 2136. An injury in fact must be a cognizable harm, but that harm may be "physical, economic, reputational, contractual, or even aesthetic." *Koziara*, 392 F.3d at 1305. "[I]n evaluating Article III's causation (or 'traceability') requirement, we are concerned with something less than the concept of 'proximate cause.'" *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). "'Proximate cause' . . . 'is not a requirement of Article III standing.'" *Moody*, 887 F.3d at 1287 (citation omitted). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family*, 344 F.3d at 1273.

An organization has suffered a concrete injury and thus "has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008).

On appeal, the plaintiffs allege (1) that the Minimum Wage Act denies Birmingham's black citizens economic opportunities and abridges their right to vote on the basis of race; (2) that these harms are fairly traceable to the Act and to

the defendants due to their enforcement roles; and (3) that their injuries can be redressed by enjoining the attorney general from enforcing the Act or by ordering the city to start enforcing Birmingham's minimum wage ordinance. The defendants contest each of these claims.

As an initial matter, we have little trouble concluding that the plaintiffs have suffered concrete injuries as a result of the Minimum Wage Act. According to the amended complaint, Lewis and Adams work in Birmingham and earn less than $10.10 per hour. Birmingham Ordinance No. 16-28 guaranteed them $10.10 per hour, adjusted annually to a cost of living index. And the Minimum Wage Act nullified Ordinance No. 16-28, in effect depriving Lewis and Adams of a significant increase in their hourly wage. If the Act is unlawful, they suffer an injury in fact with each working hour. Likewise, the plaintiff organizations, which are devoted to social, economic, and political improvements for Alabama's black citizens, have put forth sufficient facts demonstrating they have diverted resources to counteract the effects of the Minimum Wage Act on their operations. The plaintiffs have met Article III's injury requirement.

Next, we address whether these injuries can be attributed to these defendants. *See generally Hollywood Mobile Estates Ltd. v. Seminole Tribe*, 641 F.3d 1259, 1265–66 (11th Cir. 2011). We start with the attorney general. The attorney general's broad authority to interpret and enforce the Minimum Wage Act

9

illustrates his Article III connection to the defendants' harm, which is the direct consequence of the Act's continued enforcement. Alabama imbues the attorney general with sweeping authority to interpret, enforce, and defend the laws and interests of the state, *see* Ala. Code §§ 36-15-1; 36-15-12; 36-15-21, which includes the responsibility to examine the laws' "constitutional validity," *id.* § 36-15-1(7). What's more, the attorney general is given sole authority to direct and control all litigation concerning the interests of the state, *id.* § 36-15-21, and is empowered to "institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state," *id.* § 36-15-12. Undoubtedly that authority applies to the Minimum Wage Act. Indeed, the defendants conceded at oral argument that if Birmingham implemented its minimum wage ordinance in spite of the Minimum Wage Act, the attorney general could sue the city to compel compliance.

And in fact, the attorney general recently did just that. After Birmingham erected a plywood barrier around one of its Confederate monuments, the attorney general sued the city and mayor to enforce the Alabama Memorial Preservation Act, citing his general authority under Ala. Code § 36-15-12 "to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state." *See* Complaint at 1–2,

10

*Alabama ex rel. Att'y Gen. Steve Marshall v. City of Birmingham*, No. 01-CV-2017-903426.00 (Jefferson Cty. Cir. Ct. Aug. 16, 2017).[3]

Of course, the preceding discussion naturally leads us to conclude that an injunction against the attorney general "would amount to a significant increase in the likelihood that the plaintiff[s] would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010). Aside from the attorney general's authority to direct and control enforcement litigation, he is also responsible for determining whether Alabama's statutes are constitutional, Ala. Code § 36-15-1(7), and for reporting invalidated laws to the governor and judiciary committees of the legislature. *Id.* § 36-15-1(8). We have little doubt that an injunction declaring the Minimum Wage Act unconstitutional and prohibiting the attorney general from enforcing it—thereby requiring him to announce its invalidity to the governor and the legislature—would

---

[3] Because we independently take judicial notice of the attorney general's recently filed complaint, we deny Plaintiffs-Appellants' Request for Judicial Notice as moot. The defendants argue that because the Alabama Memorial Preservation Act explicitly contemplates a role for the attorney general (to collect fines), the situation in *Alabama v. Birmingham* is categorically different from the one here. We disagree. The attorney general's complaint in *Alabama v. Birmingham* asserts standing to sue *solely based on his general enforcement authority* granted in Ala. Code §§ 36-15-1; 36-15-12. And under Count 1, which seeks a declaratory judgment, the attorney general quotes from Ala. Code § 36-15-12 when proclaiming "the responsibility and duty of the Attorney General to protect the rights and interest of the state in the enforcement of its laws, including the Alabama Memorial Preservation Act." *Id.* at 4. The complaint in *Alabama v. Birmingham* provides a template for how the attorney general might likewise "protect the rights and interests of the state" in the enforcement of the Minimum Wage Act.

11

go a long way toward redressing the plaintiffs' injuries.  The plaintiffs have fulfilled the Article III standing requirements to sue the attorney general.

The City of Birmingham, on the other hand, is not a proper defendant for these claims.  The plaintiffs allege that the city's failure to enforce its own minimum wage law sufficiently connects it to their injuries sustained under the Minimum Wage Act.  But the city's refusal to implement a nullified law does not make it the cause of the plaintiffs' injuries.  And besides, the attorney general has the authority to enforce the Minimum Wage Act against the City of Birmingham, whether it wills to resist state supremacy or not.  Thus, ordering Birmingham to implement Ordinance No. 16-28 would only kick the (wrong) can down the road and leave the plaintiffs subject to the same allegedly discriminatory statute from which they seek relief.[4]  The plaintiffs' injuries are not traceable to the City of Birmingham, which is powerless to redress them.  Accordingly, we affirm the dismissal of the city from the suit, but we reverse the district court's holding that the plaintiffs lack Article III standing to assert their claims against the attorney general and the State of Alabama.

---

[4] Contrary to what the plaintiffs claim, an injunction against the City of Birmingham is unnecessary to afford them full relief.  According to the city, Ordinance No. 16-28 is still on the books.  If the Minimum Wage Act were declared unconstitutional, then the ordinance would govern Birmingham residents unless the city sees some reason to repeal or alter it.  This is the city's political prerogative, not ours.

B.

Before we move on to the merits, two other matters need addressing. Besides dismissing the plaintiffs' claims for lack of Article III standing, the district court also found that they were barred on sovereign immunity grounds.  Thus, we must determine whether the attorney general was an improper substitute for the state under *Ex parte Young*, and whether Eleventh Amendment immunity bars the Voting Rights Act claim against the State of Alabama—that is, whether § 2 of the Voting Rights Act abrogated state sovereign immunity.

The Eleventh Amendment generally bars suits against a state by its own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 10–15, 10 S. Ct. 504, 505–07 (1890). Under the longstanding doctrine enunciated in *Ex parte Young*, however, "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).  This exception to state sovereign immunity "gives life to the Supremacy Clause," *Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985), by providing private parties a means to contest continuing violations of federal law by the states.  *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 903 (2004); *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S. Ct. 1347, 1356 (1974) ("[*Ex parte Young*] has permitted the Civil War

13

Amendments to the Constitution to serve as a sword, rather than merely as a shield, for those whom they were designed to protect."). But where the state officer lacks any responsibility to enforce the statute at issue, the foundation supporting the *Ex parte Young* "fiction" erodes. In that case, "the state is, in fact, the real party in interest," and the suit remains prohibited by the Eleventh Amendment. *See Summit Med. Assocs.*, 180 F.3d at 1336, 1341.

In determining whether the Alabama Attorney General is, in fact, a proper party in interest, we turn to *Ex parte Young* for guidance. There, the Supreme Court permitted a Fourteenth Amendment suit against the Minnesota Attorney General because "[h]is power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party." *Ex parte Young*, 209 U.S. at 161, 28 S. Ct. at 454. The same is true here. As discussed above, Alabama law grants the attorney general broad authority to interpret, enforce, and defend the laws and interests of the state, *see* Ala. Code §§ 36-15-1; 36-15-12; 36-15-21, which includes the authority to examine the "constitutional validity" of the state's laws, *id.* § 36-15-1(7), and to institute, direct, and control all civil actions necessary to protect the state's interests, *id.* §§ 36-15-21; 36-15-12. The attorney general is sufficiently connected to the enforcement of the Minimum Wage Act to satisfy *Ex parte Young*'s demands.

14

Nevertheless, the defendants claim that the text of the Minimum Wage Act itself must authorize the attorney general to enforce it.  This position contradicts precedent and, as demonstrated by recent litigation, practice.  "The important and material fact," under *Ex parte Young*, is whether "the state officer, by virtue of his office, has some connection with the enforcement" of the Minimum Wage Act, "and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists."  209 U.S. at 157, 28 S. Ct. at 453.  We have no doubt the connection exists here, and that the plaintiffs have standing to assert their claims against the attorney general, for whom the Eleventh Amendment provides no shield.

Next, we consider whether the plaintiffs can sue the State of Alabama under § 2 of the Voting Rights Act.  This requires us to determine whether § 2 validly abrogated the states' Eleventh Amendment immunity from suit.  We join the Fifth and Sixth circuits in concluding that § 2 did abrogate state sovereign immunity, and thus find that we have jurisdiction to hear the plaintiffs' claim against Alabama.  *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017); *Mixon v. State of Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999); *see also Ga. State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1274 (N.D. Ga. 2017) (three-judge district court); *Ala State Conf. of NAACP v. State*, 264 F. Supp. 3d 1280, 1291–92 (M.D. Ala. 2017); *Hall v. Louisiana*, 974 F. Supp. 2d 944, 953 (M.D. La. 2013);

15

*Reeves v. U.S. D.O.J.*, 355 F. Supp. 2d 510, 515–16 (D.D.C. 2005) (three-judge district court).

In determining whether Congress has validly abrogated the states' sovereign immunity, we first ask "whether Congress has unequivocally expressed its intent to abrogate the immunity;" if it has, then we must determine "whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 116 S. Ct. 1114, 1123 (1996) (internal quotation marks omitted and alterations adopted). As to the first inquiry, we agree with the Sixth Circuit that it is "unmistakably clear in the language of the statute," *id.* at 56, 116 S. Ct. at 1123, that Congress intended § 2 to be enforced directly against the states. *See Mixon*, 193 F.3d at 398. The text of the statute explicitly prohibits "any State" from imposing voting qualifications, practices, or procedures that abridge the right to vote on account of race or color. 52 U.S.C. § 10301(a). The defendants insist that because the statute only provides an *implied* right of action, § 2 cannot have abrogated Eleventh Amendment immunity. We disagree. Congress "clearly intended" § 2 to be enforceable by private action, *Morse v. Republican Party of Va.*, 517 U.S. 186, 232, 116 S. Ct. 1186, 1212 (1996), and Congress clearly intended § 2 to be enforceable directly against the states. Accordingly, we find that Congress unequivocally expressed its intent to abrogate the states' Eleventh

16

Amendment immunity through § 2. *See Seminole Tribe*, 517 U.S. at 55, 116 S. Ct. at 1123.

In so doing, Congress acted pursuant to a valid exercise of constitutional power: § 2 of the Fifteenth Amendment. The Civil War Amendments, which "were specifically designed as an expansion of federal power and an intrusion on state sovereignty," *City of Rome v. United States*, 446 U.S. 156, 179, 100 S. Ct. 1548, 1563 (1980), *abrogated on other grounds by Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 133 S. Ct. 2612 (2013), "fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe*, 517 U.S. at 59, 116 S. Ct. at 1125. Recognizing this, the Supreme Court has held that the enforcement provision of the Fourteenth Amendment, U.S. Const. amend. XIV, § 5, extended federal power "to intrude upon the province of the Eleventh Amendment and . . . allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Seminole Tribe*, 517 U.S. at 59, 116 S. Ct. at 1125; *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455–56, 96 S. Ct. 2666, 2671 (1976). The Voting Rights Act, which "is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment," *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 126–27, 98 S. Ct. 965, 976–77 (1978), was enacted pursuant to an identical enforcement provision, U.S. Const. amend. XV, § 2, which the Supreme Court has referred to as a "parallel power to enforce the provisions of

17

the Fifteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S. Ct. 2157, 2163 (1997). The textual, historical, and jurisprudential justifications for Congress' power to abrogate state sovereign immunity through § 5 of the Fourteenth Amendment apply with equal force and validity to congressional action under § 2 of the Fifteenth Amendment. Like the Sixth Circuit, we see no reason to treat the identical provisions differently. *See Mixon*, 193 F.3d at 399. Accordingly, we conclude that Congress validly abrogated state sovereign immunity in § 2 of the Voting Rights Act; therefore, the Eleventh Amendment does not prohibit the plaintiffs' claim against the State of Alabama.

IV.

Having settled all jurisdictional disputes, we now reach the heart of the matter. Our final task is to determine whether the plaintiffs' claims survive a 12(b)(6) motion to dismiss; that is, whether the amended complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). First, we address the plaintiffs' two Fourteenth Amendment claims. We then turn to their voting claims under the Fifteenth Amendment and § 2 of the Voting Rights Act.

18

A.

The plaintiffs allege two equal protection violations in their amended complaint: (1) the Minimum Wage Act purposely discriminates against Birmingham's black citizens by denying them economic opportunities on account of their race; and (2) the Act violates the political-process doctrine by transferring control from the majority-black Birmingham City Council to the majority-white Alabama Legislature, in order to "uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored." We address each allegation in turn.

### 1. Intentional Discrimination Claim

In order to prevail on an equal protection challenge to a facially neutral law, plaintiffs must prove both discriminatory impact and discriminatory intent or purpose. *See I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014). "Discriminatory intent means that racial discrimination was a substantial or motivating factor behind enactment of the law." *Id.* (alteration adopted) (internal quotation marks omitted). Because "[o]utright admissions of impermissible racial motivation are infrequent," *Hunt v. Cromartie*, 526 U.S. 541, 553, 119 S. Ct. 1545, 1552 (1999), "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.

19

Ct. at 564. "Subjects of proper inquiry in determining whether racially discriminatory intent existed" include: the racial "impact of the official action;" the "historical background of the decision;" the "specific sequence of events leading up" to the challenged law; departures from substantive and procedural norms; and "legislative or administrative history." *Id.* at 266–68, 97 S. Ct. at 564–65.

Our starting point is the law's impact. *See id.* at 266, 97 S. Ct. at 564. The Minimum Wage Act denied 37% of Birmingham's black wage workers a higher hourly wage, compared to only 27% of white wage workers. What's more, black wage workers in Birmingham make, on average, $1.41 less per hour than white wage workers, and $2.12 less per hour statewide. Given these numbers, we find it plausible that the Minimum Wage Act "bears more heavily on one race than another." *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1045 (11th Cir. 2008).

The defendants, however, maintain that these "cherry picked" statistics fail to demonstrate disparate impact because the Minimum Wage Act applies statewide and inures to the general benefit. To accept this argument would be to ignore the allegations in this case. The Minimum Wage Act was passed in direct response to Birmingham's minimum wage ordinances, which made it the only municipality in Alabama guaranteeing an hourly wage above the federal floor. Thus, it was not "cherry picking" for the plaintiffs to focus on Birmingham, the community at

20

which the law was primarily directed and where its impact was most transparent. This is not the place to debate the Minimum Wage Act's long term macroeconomic merits. What we know from the pleadings is that the Act immediately denied a significant wage increase to roughly 40,000 Birmingham residents, the vast majority of whom were black. These facts are more than sufficient to support a plausible allegation that the Minimum Wage Act burdens black citizens more than white ones.

This leads us to the more challenging question: have the plaintiffs alleged facts plausibly supporting a conclusion that the Minimum Wage Act was enacted with a discriminatory purpose? A sensitive inquiry into the direct and circumstantial evidence leads us to conclude that they have. *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564.

The plaintiffs' amended complaint presents detailed factual allegations which go to the heart of multiple *Arlington Heights* considerations, including the disproportionate effect of the Minimum Wage Act on Birmingham's poorest black residents; the rushed, reactionary, and racially polarized nature of the legislative process; and Alabama's historical use of state power to deny local black majorities authority over economic decision-making. The Minimum Wage Act responded directly to the legislative efforts of the majority-black Birmingham City Council, which represents more black citizens (and more black citizens living in poverty)

21

than any other city in Alabama.  The Act swiftly nullified efforts of those

Birmingham City Council members to benefit their majority-black constituents

even though the Alabama legislature had previously "failed to take any action to

establish a statewide minimum wage law and had [ ] been indifferent to efforts to

establish such a law."  D.E. 18 at ¶ 83.  The Act was introduced by a white

representative from Alabama's least diverse area, with the help of fifty-two other

white sponsors, and was objected to by all black members of the House and

Senate.  And it was accelerated through the legislative process in sixteen days with

little or no opportunity for public comment or debate.  These facts plausibly imply

discriminatory motivations were at play.

Furthermore, the plaintiffs put forth extensive evidence suggesting that the

Minimum Wage Act reflects Alabama's longstanding history "of official actions

taken for invidious purposes."  *Arlington Heights*, 429 U.S. at 267, 97 S. Ct. at

564.  Rooted into the foundations of the state's 1901 Constitution, *Hunter v.*

*Underwood*, 471 U.S. 222, 229, 105 S. Ct. 1916, 1920–21 (1985), Alabama's

"deep and troubled history of racial discrimination," *I.L.*, 739 F.3d at 1288, has

consistently impeded the efforts of its black citizens to achieve social and

economic equality.  *See Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1356–60

(M.D. Ala. 1986); Wayne Flynt, *Alabama's Shame: The Historical Origins of the*

*1901 Constitution*, 53 Ala. L. Rev. 67, 70–76 (2001).  Although the defendants

22

question the relevance of this history, we have repeatedly reaffirmed its importance when determining whether neutral laws may nonetheless bear discriminatory purposes. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999). Here, the plaintiffs allege that the circumstances of the Minimum Wage Act reflect a motivation consistent with Alabama's many historical "barriers [erected] to keep black persons from full and equal participation in the social, economic, and political life of the state." *Dillard*, 640 F. Supp. at 1360. We believe their "allegations entitle them to make good on their claim." *Gomillion v. Lightfoot*, 364 U.S. 339, 341, 81 S. Ct. 125, 127 (1960).

The defendants respond that the Minimum Wage Act is a neutral, economic law similar to the one adopted by twenty-two other states, and that the plaintiffs' allegations of discrimination cannot overcome the law's obvious legitimate purpose. Likewise, the district court held that because legitimate reasons support the legislation, *Arlington Heights* is inapposite, and "only the clearest proof will suffice" to establish discriminatory intent. This position gravely misstates the law.

The inquiry before us is simply whether the plaintiffs have plausibly stated a claim of disparate impact and discriminatory intent. If they establish their allegations, the defendants will have their turn to prove that "the same decision would have been made for a legitimate reason," *Burton*, 178 F.3d at 1189—a factual demonstration which cannot be settled on their motion to dismiss.

23

But most perturbing is the so-called "clearest proof" standard applied by the district court and defended on appeal. Recklessly plucked from an unrelated line of precedent, this requirement runs contrary to decades of established equal protection jurisprudence. The district court derived the "clearest proof" rule from a line of cases dealing with ex post facto challenges to civil statutes. *See Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 1147 (2003); *Flemming v. Nestor*, 363 U.S. 603, 80 S. Ct. 1367 (1960). Even a slight bit of context illustrates the danger of extracting this law from its intended setting: "'only the clearest proof' will suffice *to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty*." *Smith*, 538 U.S. at 92, 123 S. Ct. at 1147 (emphasis added). This standard has no place in equal protection law, which remains governed by the longstanding framework established in *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564. *See also Veasey v. Abbott*, 830 F.3d 216, 231 n.12 (5th Cir. 2016) (rejecting "clearest proof" standard in voting rights context).

Requiring the "clearest proof" of discriminatory purpose not only ignores the history of equal protection law but also turns a blind eye to the realities of modern discrimination. Today, racism is no longer pledged from the portico of the capitol[5] or exclaimed from the floor of the constitutional convention;[6] it hides,

---

[5] *See Inaugural Address of Governor George C. Wallace, January 14, 1963*, at 2, Alabama Department of Archives & History, http://digital.archives.alabama.gov/cdm/ref/collection/

abashed, cloaked beneath ostensibly neutral laws and legitimate bases, steering government power toward no less invidious ends. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S. Ct. 2077, 2082 (1991) ("Racial discrimination" is "invidious in all contexts."). Recognizing this truth over forty years ago, the Supreme Court mandated that we review both direct and circumstantial evidence to determine whether, absent an outright admission, some discriminatory purpose may yet exist; and it planted signposts to help guide this inquiry. *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564; *see also Hunt*, 526 U.S. at 553, 119 S. Ct. at 1552. Here, a sensitive but thorough examination of the plaintiffs' detailed allegations leads us to conclude that they have plausibly alleged a discriminatory motivation behind the Minimum Wage Act, despite the law's neutrality and rationale. This is all that is required for their claim to survive a motion to dismiss. We say nothing of "the ability of petitioners to sustain their allegations by proof," but we do hold that they have the right to try. *Gomillion*, 364 U.S. at 341, 81 S. Ct. at 127. Accordingly, we reverse the dismissal of their Fourteenth Amendment intentional discrimination claim against the attorney general.

---

voices/id/2952 ("I draw the line in the dust and toss the gauntlet before the feet of tyranny . . . and I say . . . segregation now . . . segregation tomorrow . . . segregation forever.").

[6] *See* 1 Journal of the Proceedings of the Constitutional Convention of the State of Alabama, Commencing May 21st, 1901, at 9 (1901) ("And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.").

## 2. Political-Process Claim

The plaintiffs' second theory for equal protection relief rests on the political-process doctrine. This doctrine evolved from the Supreme Court's recognition that the Fourteenth Amendment guarantee to "full participation in the political life of the community" extends to "a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467, 102 S. Ct. 3187, 3193 (1982) (citation omitted). Historically, this equal protection principle has prohibited majorities from restructuring the political process to frustrate the ability of minorities to enact legislation explicitly addressing "racial issues." *See, e.g.*, *Seattle*, 458 U.S. at 474, 102 S. Ct. at 3197 (school integration); *Hunter v. Erickson*, 393 U.S. 385, 386, 89 S. Ct. 557, 558 (1969) (fair housing).

However, the Supreme Court's most recent consideration of the doctrine has called its former interpretations into question. In *Schuette v. Coalition to Defend Affirmative Action*, ___ U.S. ___, 134 S. Ct. 1623 (2014), five justices repudiated the traditional political-process framework, either in part, *id.* at ___, 134 S. Ct. at 1631–37 (plurality opinion), or in whole, *id.* at ___, 134 S. Ct. at 1643 (Scalia, J., concurring in the judgment). These justices were in agreement that the broad

26

rationale of *Seattle*, which would require courts "to determine and declare which political policies serve the 'interest' of a group defined in racial terms," "has no support in precedent," "raises serious constitutional concerns," and "must be rejected." *See id.* at ___, 134 S. Ct. at 1634 (plurality opinion); *id.* at ___, 134 S. Ct. at 1640 (Scalia, J., concurring in the judgment). *But see id.* at ___, 134 S. Ct. at 1659 (Sotomayor, J., dissenting) (reaffirming the traditional *Seattle* framework). While refusing to overturn *Hunter* and *Seattle*, the plurality opinion suggested that these cases are "best understood" as those where "the state action in question . . . had the serious risk, if not purpose, of causing specific injuries on account of race." *Id.* at ___, 134 S. Ct. at 1633 (plurality opinion). *But see id.* at ___, 134 S. Ct. at 1640 (Scalia, J., concurring in the judgment) (calling this interpretation "cloudy and doctrinally anomalous").

Mindful of the doctrine's historical standing and the Supreme Court's recent directives, we turn, cautiously, to whether the plaintiffs have stated a plausible political-process claim. A comparison to the salient precedent, in light of the Court's recent interpretation, leads us to conclude that they have not. The minimum wage laws at issue here are neutral, economic regulations that impact a significant percentage of both black and white hourly wage workers. *Cf. Schuette*, ___U.S. at ___, 134 S. Ct. at 1653 (Sotomayor, J., dissenting) ("*Hunter* and *Seattle*" recognized that "[w]hen the majority reconfigures the political process in a

27

manner that burdens only a racial minority, that alteration triggers strict judicial scrutiny."). Thus, while we acknowledge the social and economic history behind the plaintiffs' assertion that the minimum wage is a racial issue, their claim still falls outside the Supreme Court's limited application of the political-process doctrine to laws explicitly addressing racial harms such as segregation, *Seattle*, 458 U.S. at 474, 102 S. Ct. at 3197, and discrimination in the housing market, *Hunter*, 393 U.S. at 386, 89 S. Ct. at 558. *See Schuette*, ___U.S. at ___, 134 S. Ct. at 1635 (plurality opinion) (rejecting broad interpretation of *Seattle* because it would apparently have "no limiting standards" and could be read to include "wage regulations"). And to the extent that the plaintiffs allege that the minimum wage policy was "racialized" because the "Birmingham African-American community strongly favored" it, that argument clashes with the Supreme Court's clear instructions in *Schuette*, ___ U.S. at ___, 134 S. Ct. at 1634, and cannot sustain their claim. Accordingly, we affirm the dismissal of the plaintiffs' Fourteenth Amendment political-process claim.

## B.

Finally, we address whether the plaintiffs have stated plausible voting rights claims under the Fifteenth Amendment and § 2 of the Voting Rights Act. In their amended complaint, the plaintiffs allege that the Minimum Wage Act abridges their right to vote on account of race, because it "reverses a scheme of local control

28

by citizens of Birmingham over the power to enact minimum wages" and "prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government." The plaintiffs' voting claims fall short for the simple reason that their allegations have nothing to do with voting.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764 (1986). The plaintiffs allege that the Minimum Wage Act affects their ability to participate in the political process because it now occupies a field in which a majority-black legislature previously enacted laws that they support. But this grievance is simply not one recognized by § 2 of the Voting Rights Act. Section 2, which gives effect to the Fifteenth Amendment's guarantees, protects against any "standard, practice, or procedure . . . which results in a denial or abridgement of the right . . . to vote on account of race or color," due to unequal opportunity "to participate in the political process and to elect representatives of [one's] choice." 52 U.S.C. § 10301. The Supreme Court has emphasized that the statute protects only one right—the right *to vote*—and that "the opportunity to participate and the opportunity to elect [are] inextricably linked." *Chisom v. Roemer*, 501 U.S. 380, 397, 111 S. Ct. 2354, 2365 (1991). But here, the plaintiffs have not alleged any

29

denial, abridgment, or dilution of their voting ability in connection with any election—past or future—as a result of the Minimum Wage Act.  And we find no authority under § 2 for a free-floating political process right unrelated to any vote or election.  Therefore, because the plaintiffs have not plausibly alleged the invasion of any legal rights established by the Fifteenth Amendment or § 2 of the Voting Rights Act, we affirm the dismissal of those claims against the attorney general and the State of Alabama.

V.

The plaintiffs have stated a plausible claim that the Minimum Wage Act had the purpose and effect of depriving Birmingham's black citizens equal economic opportunities on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment.  Accordingly, we reverse the dismissal of that claim against the Attorney General of Alabama.  We affirm the dismissal of all other claims and all other defendants.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**